No. 75,381

STATE OF KANSAS, *Appellee,* v. JOHN E. CHEEK,
*Appellant.*

(936 P.2d 749)

Opinion filed April 18, 1997.

*Carl Cornwell,* of Cornwell & Edmonds, of Overland Park, argued the cause, and *Lindsey P. Erickson,* of the same firm, and *Keith C. Sevedge,* of Lenexa, were with him on the briefs for appellant.

*Michael A. Russell,* assistant district attorney, argued the cause, and *Nick A. Tomasic,* district attorney, and *Carla J. Stovall,* attorney general, were with him on the brief for appellee.

*James F. Vano*, of Overland Park, and *G. Gordon Atcheson*, of Blake & Uhlig, P.A., of Kansas City, were on the brief for *amicus curiae* the Kansas Association of Criminal Defense Lawyers.

The opinion of the court was delivered by

LARSON, J.: John E. Cheek appeals his jury convictions of first-degree murder and aggravated assault, alleging seven trial errors. John, an off-duty Kansas City, Kansas, police officer, claims he was justified in shooting security guard Milton Foster at a restaurant and bar in Bonner Springs, Kansas, while attempting to effectuate an arrest.

Because the result we reach is based on reversible error during jury deliberations, we will highly summarize a factual record containing extremely contentious and highly divergent testimony during a 18-day jury trial. This is a high visibility case with intense community interest.

*Factual background*

Prior to his death at Ziffels Restaurant and Bar in Bonner Springs, Kansas, on October 29, 1994, Milton Foster had filed a formal complaint with Internal Affairs against two Kansas City, Kansas, police officers, defendant and his younger brother, Jeff Cheek. Foster alleged a pattern of harassment starting in November 1993, primarily by Jeff, but also by John, and altogether described about 9 incidents involving himself or a friend and one of the Cheek brothers.

On the day of the fatal shooting, John, his wife, and Jeff met four friends, including another police officer, at Ziffels. Inside, they noticed the brothers' uncle, Dan Harlan, sitting with his friend and two other couples.

At about 9:15 p.m., Foster, who was working Friday and Saturday nights at Ziffels as a security guard, arrived and walked to the bar, wearing a 9mm gun. The Cheeks become aware of Foster, and either after a confrontation with him at the bar or while the Cheeks were walking to the foyer to use a telephone, a fight ensued between Foster and the Cheek brothers, which continued outside the building. A 911 call was made at 9:27 p.m. by a bartender, notifying the police of a bar fight.

Numerous persons, including Rusty Moretine and Chris McDonald, followed Foster and the Cheeks outside. At some point in the melee, Foster struck John on the head with an asp, a long black baton, causing a bloody laceration. Several witnesses also saw Foster draw his gun. In addition, McDonald punched Jeff in the face. A few seconds after the first 911 call, Harlan also called 911 and stated, "There is a man with a gun out here."

The altercation outside lasted several minutes. As Foster returned inside Ziffels, John headed to his car and retrieved his gun. Jeff and John reentered the bar, possibly forcing their way inside past Moretine. Foster was still holding his asp, but did not appear to have his gun drawn. There was testimony that once inside, both John and Jeff were struck several times by the asp. Both brothers suffered numerous injuries from the asp, especially to their arms and hands, either during the fight outside or once they returned inside the bar.

Less than a minute after the Cheeks reentered Ziffels, John fired four rounds from his police revolver at Foster. Foster died a few minutes after the first police officers arrived at the scene. Foster suffered five wounds from the four bullets and had no other injuries, aside from a line down his forehead, which may have been caused by hitting himself with the asp.

After Foster had fallen from his wounds, John retrieved Foster's pistol. Both weapons were quickly confiscated by Bonner Springs police officers. Although several patrons immediately left the scene of the crime, those remaining were asked to go outside and give statements to the police. The majority of these statements were obtained by one officer, who took 26 different statements. Many of the statements were filled out by persons standing around in various groups. No effort was made to separate the witnesses, and many were discussing what they had witnessed.

John and Jeff were held at the scene for about an hour before they were transported to the hospital for treatment. Before their departure, another officer performed a breath test on the brothers which indicated no alcohol was present in their bodies. McDonald also went to the hospital to have his hand treated. He was placed in a room with John with a curtain dividing the room. He alleged

that he heard a conversation between John and unknown police officers informing John he was going to be charged with murder and telling him what his defenses would be. John was placed under arrest at the hospital, but remained hospitalized for 2 days.

Two days later, John was charged with one count of first-degree murder for killing Foster and one count of aggravated assault upon Rusty Moretine. John pled not guilty and alleged he had been attempting to effectuate a lawful arrest and had used reasonable force to do so, as he had been trained.

The trial court ruled on several pretrial motions as well as numerous motions and objections during the highly charged trial. There was a large amount of publicity, and apparently some concerns of rioting were voiced. During jury selection, several of Cheek's peremptory strikes were challenged as race-related, and the trial court decided that defense counsel had provided insufficient race-neutral reasons to strike five jurors. Three jurors on the final panel were dismissed from the case, including one during deliberations, which is the alleged error in the principal issue on appeal. The factual statements relating thereto will be discussed in greater detail when considering this issue.

Under the State's theory of the case, John committed premeditated murder upon Foster. The State argued that the Cheek brothers had a history of harassing Foster, who had been frightened of John. Many of the State's witnesses stated that one or both of the Cheeks began arguing with Foster inside the bar until someone said they should "take it outside;" some testified they saw Jeff throw the first punch as Foster was following the men out of the bar.

Some of the State's witnesses also stated that Foster was heading back inside as John was getting his weapon, having said he was going to kill Foster. Some also claimed John forced his way back inside the bar by pointing a gun at Moretine, despite being told that the police had already been called and were on their way.

Once inside, several of the State's witnesses said that John shot Foster after saying something like, "Hit me with that baton one more time." Numerous State witnesses testified that Foster was still swinging his asp inside Ziffels, and some said they thought

Foster struck the Cheeks with it while inside. However, no State witness said they heard John declare that he was a police officer or that Foster was under arrest and was to drop his weapons, although several acknowledged that John was yelling something that they could not hear.

John defended by claiming that he was attempting to effectuate an arrest upon Foster after Foster feloniously attacked him and his brother in the parking lot. John's evidence indicated that upon seeing Foster in the bar, he noticed Foster was armed, sought out his brother, and went with Jeff to the foyer to call the police. John contended that Foster followed the brothers into the foyer and that Foster kicked Jeff out the doors as he was starting to make the call. After the brothers began fighting back, Foster drew his asp, and Jeff was attacked by several other men. Foster struck John with the asp numerous times. When Foster finally backed away from attacking John, he drew his pistol and started waving it around, pointing it at various persons.

John testified he then recovered his weapon from his car and pointed it at Foster, who began backing into the bar. John claimed he advanced, yelling, "Drop your weapon. You're under arrest, Milton." John continued advancing past some men standing in the doorway, who moved aside as he approached after being told he was a policeman. Upon reentering with Jeff, John placed his weapon in his waistband to reassess the situation, but Foster immediately began striking both John and Jeff. Foster kept swinging, and John said, "Don't hit me again." Foster struck again, and John pulled his pistol and fired four shots, as he said he had been trained to do. Although this testimony came from John, Jeff and other witnesses told this story as well.

During the trial, the State was allowed to admit testimony regarding the alleged instances of harassment of Foster by the Cheeks. Although John was able to provide evidence as to whether these incidents actually took place and what actually occurred, he was not permitted to admit evidence regarding the outcome of the Internal Affairs investigation and why he was concerned about Foster working as a security guard in Kansas City, Kansas. Nor was

John allowed to present expert testimony as to how a police officer is trained to handle such situations.

In the jury instructions, the trial court specifically instructed the jury that John was not acting as a police officer when the shooting took place. The court also refused to give a self-defense instruction, stating that self-defense was covered in the citizen's arrest instruction. The court also instructed on second-degree murder, voluntary manslaughter, and involuntary manslaughter.

The jury returned a verdict of guilty on the counts of first-degree murder and aggravated assault. John was sentenced to life with 25 years without parole and a concurrent sentence of 12 months for the assault charge. John appealed, alleging the following trial errors:

1.   The trial court's restrictions on the presentation of John's full theory of defense impermissibly abridged his right to a fair trial.

2.   The trial court's jury instructions impermissibly tainted the outcome of John's trial by effectively negating a primary theory of defense.

3.   The trial court's use of the pattern instruction on first-degree murder impermissibly abridged John's due process rights.

4.   The trial court's admission of evidence offered by the State without prior disclosure violated the pretrial order, materially affecting the conduct of John's defense.

5.   The trial court's negation of John's peremptory jury strikes as racially motivated under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), constitutes a reversible abuse of trial court discretion.

6.   The trial court's dismissal of a juror during deliberations impermissibly tainted the outcome of John's trial.

7.   Cumulative effects of trial errors prejudiced John's opportunity for a fair trial.

We first address the issue of removal of a juror during deliberations, which we hold resolves the ultimate question in this appeal.

*Arguments and authorities*

After oral arguments and jury instructions were completed, the jury began deliberations in the afternoon on July 27, 1995. The jury deliberated that afternoon and decided to resume deliberations the following morning. The first thing in the morning, juror Barnes informed a bailiff that he wished to be released from the jury. When Barnes was called before the judge, the prosecutor, the defendant, and the defendant's counsel, the court immediately informed him that "there's not too much of what's going on in your mind that we can get into. . . . We can't get into the reasons that you want to get off. Especially if they have to do with how the deliberations are going."

Barnes then said, "I think I can state my very strong position on the way I feel without saying anything either way." The court replied, "Okay. Let's try." Barnes declared, "I very strongly feel that there's no decision to be reached and I can't—[interrupted]." The court then pointed out that the jury had only deliberated an hour and a half and that all the court needed to know was whether he could do his job and remain fair and impartial and stick to his convictions. The court continued to suggest that Barnes search his conscience and that if he found he could be fair to both sides, he was going to be asked to continue to deliberate. Barnes expressed frustration over not being able to explain some of his reasons and stated, "[I]f it's going to boil down to a question of whether or not I can be fair and impartial, based on my feelings and my convictions, I don't think that I can arrive at that sort of decision."

The court indicated an inclination to release Barnes and, while the prosecution did not object, the defense counsel objected, stating, "Mr. Barnes has made some comments that he didn't think a decision could be made. . . . On behalf of the defendant I would like to say I object. " The court then spoke to Barnes:

"[I]f you think you can go in there and do a good job personally and work with these folks towards reaching a decision whichever way then I want you in there. . . . [I]f you feel like you can do that and still be, you know, not only fair to each side but to your own convictions then I [would] just as soon have you on the jury. But if you're telling me that because of your feelings you can't do that

then I'm going to release you over the defendant's objection. So I guess I need to know from you if in fact that's how you feel. Are you willing to give it a shot or are you ready to—"

Barnes answered, "No, Your Honor. Like I say, it's frustrating, like I say, not to be able to discuss it." Barnes went on to say he was unconcerned with the high-profile nature of the case. The court again asked whether Barnes would somehow be prevented from being fair and impartial, to which Barnes answered affirmatively.

The court then decided, with permission from the prosecutor, defense counsel, and John, to talk with Barnes alone, outside the presence of counsel and the defendant. After they were alone, the court asked Barnes whether he could explain more about why he wanted off the jury.

"JUROR BARNES: Well, I listened to all the testimony, carefully.

"THE COURT: Yes, sir.

"JUROR BARNES: Tried to be very careful to listen to both sides of the testimony. I know we're not supposed to form opinions as going along but I think as it goes along you have to—you have to be swayed one way or another. You can't go into that jury room I don't believe being completely neutral. . . . I had my feelings and my mind was completely made up when I went in there. I was genuinely surprised and shocked at—

"THE COURT: All the different—

"JUROR BARNES: Completely different that other people felt and I will say in my opinion the majority of the people felt. And I really believe that I understand that we should go into the jury room and if you have the strength of your convictions nobody should be able to change your mind but on the other hand I understand that points of view and opinions are expressed and therefore their minds can be changed. To this point, Your Honor, I don't—I've listened to the testimony. I've made my decisions and I can't in all good conscience expect that they're going to change my mind.

"THE COURT: Well, see and I can appreciate that Mr. Barnes. In a situation like that, you know, that's kind of one of the things people were asking, can you stick to your guns if that's the way you believe.

"JUROR BARNES: Yes, sir.

"THE COURT: And are you telling me that there's so much pressure in there that you don't feel like you can do that?

"JUROR BARNES: I will say, Your Honor, that there are such strong feelings on both sides that I don't think there's any way in the world that we could arrive at a decision if I stick with my convictions the way I feel. I don't feel that I'm going to sway the majority of the jurors in there to my position and I don't—I

just don't think I honestly feel that we cannot—it may sound that I'm being very premature but—

"THE COURT: Well, that would—any comment—

"JUROR BARNES: Yes sir, I understand that you would think that but I can only say that I—I'm deeply sincere in my convictions that-

"THE COURT: Can I ask you this—

"JUROR BARNES: No decision—

"THE COURT: Can I ask you this, Mr. Barnes, would you be willing to try and deliberate through today and see where you are at the end of the day? Would you be willing to give that a shot? Don't let me sway you one way or the other that's just a suggestion.

"JUROR BARNES: Yes, sir.

"THE COURT: If you tell me you want off—not everybody's suited for this sort of pressure and nor should they be subjected to it and I understand that and if you are telling me that you just don't want to be a part of that because of the pressure and because of your convictions then I'm going to let you off. Cause I'm not going to make anybody do that. So I guess the option is really up to you, sir. I'm willing to let you off but I want to know from you if you're willing to give it another—another day?

"JUROR BARNES: To be truthful with you, Your Honor, I didn't arrive at this decision lightly.

"THE COURT: I can appreciate that.

"JUROR BARNES: I really don't think that my decision will be changed at any point no matter how long we were in there. That's—

"THE COURT: Okay.

"JUROR BARNES: And, I'm really very sorry that this had to happen.

"THE COURT: Well, I can appreciate that too, Mr. Barnes. And I want to tell you I'm going to let you off and I'm going to use the first alternate."

The record then continues with a discussion of how the release was to be accomplished, but it is clear that at no point did Barnes suggest that he could not deal with the pressure or that there was any other reason to necessitate his release. Clearly, all of his statements directly implied that if he remained on the jury, it would not be able to render a decision.

John's objection was clearly made, properly preserved, and fully argued on appeal. Although his objection is couched in the trial court's failure to properly allow Barnes to continue on the jury, he also contends it was reversible error to allow the juror to be replaced by an alternate without the court instructing the jury to begin deliberations anew. *Amicus curiae* suggests the trial court should have required Barnes to continue deliberations, focusing on

the defendant's right under the Sixth Amendment to the United States Constitution to a unanimous jury verdict, which it asserts is preserved in Kansas through Sections 5 and 10 of the Kansas Constitution Bill of Rights.

As we will hereafter develop, the ultimate issue upon which our decision turns is whether reasonable cause existed to replace Barnes, but we will also reach the question of whether the failure to instruct the jury to begin deliberations anew is also reversible error.

The statutory basis for utilization of alternate jurors is set forth in K.S.A. 22-3412(c), which in applicable part states:

"Immediately after the jury is empaneled and sworn, a trial judge may empanel one or more alternate or additional jurors whenever, in the judge's discretion, the judge believes it advisable to have such jurors available to replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable to perform their duties. . . . Such alternate jurors shall be seated near the other jurors, with equal power and facilities for seeing and hearing the proceedings in the case, and they must attend at all times upon the trial of the cause in company with the other jurors. They shall obey the orders of and be bound by the admonition of the court upon each adjournment, but if the regular jurors are ordered to be kept in custody during the trial of the cause, such alternate jurors also shall be kept in confinement with the other jurors. Upon final submission of the case to the jury, the alternate jurors may be discharged or they may be retained separately and not discharged until the final decision of the jury. If the alternate jurors are not discharged on final submission of the case and if any regular juror shall be discharged from jury service in any such action prior to the jury reaching its verdict, the court shall draw the name of an alternate juror who shall replace the juror so discharged and be subject to the same rules and regulations as though such juror had been selected as one of the original jurors."

In discussing the substitution of jurors after deliberations have begun, 75B Am. Jur. 2d, Trial § 1699, relates:

"The substitution of an alternate juror for an original juror is constitutionally permissible after deliberations have begun where good cause has been shown and the jury has been instructed to begin deliberations anew.

"The circumstances permitting substitution of an alternate when a deliberating juror dies, becomes ill, or is otherwise unable to continue are precisely the circumstances mandating substitution of a juror during the trial itself. Because they relate exclusively to the personal situation of the juror himself and not to his interaction with the other jurors or with the case itself, they are ordinarily not circumstances having the capacity to affect the substance or the course of the

deliberations. Hence, the continuation of the trial with a substituted alternate is in the circumstances no way violative of defendant's right to trial by a fair and impartial jury.

. . . .

"When considering whether to replace a juror after deliberations have begun, the failure to take adequate safeguards can produce two negative consequences. First, inadequate inquiry can result in the removal of the juror who simply cannot in good conscience vote for conviction when the other jurors all agreed. Second, when substitution is necessary, the failure to instruct the jury to begin anew with their deliberations might result in a premature verdict."

John makes two principal arguments concerning the juror substitution issue. The first is that Barnes was improperly removed; the second is that the replacement juror joined deliberations without the required court instruction for the jury to begin deliberations anew. In addressing the second and then the first of these arguments, we set forth the development of Kansas law under the juror replacement statute.

We first dealt with replacement of a juror by an alternate under the current statute in *State v. Folkerts*, 229 Kan. 608, 616, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981). The defendant alleged error after one of the jurors was replaced with an alternate prior to deliberations without an in-court, on-the-record examination of the juror. The facts showed that during a weekend recess one of the jurors contacted the trial judge and advised the judge of her grandfather's death and her need to attend the out-of-state funeral. The trial court, who had previously selected two alternate jurors, proceeded to excuse the juror and appoint one of the alternates. In approving this procedure, we stated:

"Our statute K.S.A. 22-3412(3) is similar to F.R.Cr.P. 24(c) and under the federal cases it is well established that the substitution of an alternate for a juror for reasonable cause is within the prerogative and discretion of the trial court. *United States v. Ellenbogen*, 365 F.2d 982 (2d Cir. 1966), *cert. denied* 386 U.S. 923 (1967). See also, 2 Wright, Federal Practice and Procedure: Criminal § 388, and Annot., 10 A.L.R. Fed. 185. The point is without merit." 229 Kan. at 616.

The question arose again in *State v. Haislip*, 237 Kan. 461, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985), where it was noted that the juror in *Folkerts* was dismissed and substituted prior to the time the jury retired to begin its deliberations, while the jury

in *Haislip* had already begun deliberating. After commenting on differences between K.S.A. 22-3412 and Federal Rule of Criminal Procedure 24, we held:

"K.S.A. 1984 Supp. 22-3412(3) allows for substitution of an alternate after deliberations have begun as long as the alternate has not been discharged. Therefore, there is no 'right' under Kansas law to the original twelve jurors. . . .

"In the case at bar, the alternate had not been discharged when deliberations commenced. The court had, in fact, sequestered the alternate while the jury deliberated. Once the alternate was substituted, the court instructed the jury to begin its deliberations anew. This instruction was necessary as a defendant has a right to a verdict only after full participation of all of the jurors who ultimately return the verdict. *People v. Collins*, 17 Cal. 3d 687, 131 Cal. Rptr. 782, 552 P.2d 742 (1976).

"Under Kansas law, if the alternate was not discharged and the court instructed the jury to begin deliberations anew after substitution, the standard to determine whether the trial court erred in dismissing and substituting a juror after deliberations had begun is the same as the standard for determining whether the court erred in discharging a juror prior to deliberations. Accordingly, we must apply the 'reasonable cause' standard which was followed in *Folkerts*. In *Folkerts*, this court specifically stated that it was following the mandate of federal cases interpreting Fed. R. Crim. Proc. 24 when it adopted the 'reasonable cause' standard. Therefore, we will look to federal law for guidance in determining whether the trial court, in the case at bar, abused its discretion.

"In 2 Wright, Federal Practice and Procedure: Criminal § 388 pp. 386-89 (1982), it is stated:

'The substitution of an alternate for a juror for reasonable cause is within the prerogative of the trial court *and does not require the consent of any party*. The court has discretion in deciding when to make such a substitution. It also has discretion in the procedure to be used to ascertain whether a substitution should be made. Every effort should be made to give defendant and his counsel an opportunity to be heard before making such a substitution, but absent a showing of prejudice, reversal is not required for failure to do so.' (Emphasis added.)

"In this case, the court refused to hold a hearing to examine the juror more fully about her reasons for wanting to be excused. Although it would have been a *better practice* for the court to have conducted a hearing, the defendant has failed to show he was prejudiced by the lack of one. See, *e.g.*, *Commonwealth v. Haywood*, 377 Mass. 755, 388 N.W.2d 648 (1979). Therefore, we cannot find that the court erred by excusing the juror without a hearing.

"The court relied on the juror's note and her statements during voir dire in finding she was mentally incapacitated to perform her duty." 237 Kan. at 468-69.

The dismissal of the juror in *Haislip* was due to the special pressures she had experienced which had hampered her ability to be

fair and impartial. We found the trial court had not abused its discretion in finding there was reasonable cause to dismiss this juror.

John points to the failure of the trial court in this case to instruct the jury to begin its deliberations anew after the addition of the new member. The record is totally silent as to the trial court's compliance with this mandate from *Haislip*. While our case law certainly requires the giving of the instruction and the beginning of deliberations anew, we have not found this failure to require a new trial in every instance.

In *State v. Stafford*, 255 Kan. 807, 824, 878 P.2d 820 (1994), a juror was dismissed during the sentencing portion of a hard 40 case under circumstances we will explore more fully, but as to the argument that the trial court improperly failed to instruct the jury to begin its deliberations anew, our opinion noted:

"Stafford argues that the trial court erred in its instruction to the jury after the alternate juror was substituted. The court instructed the jury, '[Y]ou may now resume your deliberations; and Ms. Tuttle is unable to continue and Ms. Heller is now a member of the jury with a full voice in discussions and a vote on the issues.' Stafford failed to object to this instruction and thus is barred from raising a claim of error on appeal. In any event, this instruction does not amount to reversible error. Stafford points out that in *Haislip*, 237 Kan. 469, the trial court after replacing a juror instructed the jury to begin its deliberations anew; this court stated: 'This instruction was necessary as a defendant has a right to a verdict reached only after full participation of all the jurors who ultimately return the verdict.' After replacing a juror, the trial court should instruct the jury to begin its deliberations anew. Though the jury here was instructed to 'resume' its deliberations rather than 'begin anew' its deliberations, the instruction given by the trial court did inform the jury that the substitute juror was to fully participate in discussions and vote on the verdict. This instruction, while not recommended, does not amount to reversible error, particularly in light of what follows."

In *Stafford*, we went on to find that the juror was dismissed without reasonable cause, so we had no need to base our decision to reverse on the failure to give a proper instruction to begin deliberations anew. Additionally, the difference between the wording to "resume" deliberations rather than to "begin anew" is much less significant in *Stafford* than in our case, where the record fails to show the court gave any type of a instruction to the jury regarding

its obligation to involve the alternate juror in the deliberation process from the beginning.

Although the record is not precise in our case, the time the original juror was involved in deliberations (approximately an hour and a half) and the fairly short period of time after the alternate was seated before a verdict was obtained (also approximately an hour and a half) might be factors to be considered in determining if sufficient prejudice exists to require a new trial on this failure alone. While the issue has been raised, we do not believe it was sufficiently framed so that we should find the failure to give the required instruction to begin deliberations anew in this instance is, by itself, reversible error. This is not to say that under the right set of circumstances we would not do so, and we caution and direct trial courts, who of necessity seat alternate jurors during deliberations, that an obligation exists to instruct the jury that the new juror must be involved with and participate in the entire deliberation process.

Although it was not a claimed error, the record also reflects that the alternate jurors may have expressed opinions before joining the deliberation. Additionally, John presented testimony that the alternates may have overheard conversations between law enforcement officers while the jury was deliberating. Neither fact is extensively argued to us, but we point out to trial courts the necessity of keeping alternates in the posture of actual jury members until a verdict is reached and they are discharged from service.

The matter, however, which is most troubling to this court is the dismissed juror's unequivocal statements to the trial court, out of the presence of the prosecutor, defense counsel, and defendant, that if he remained on the jury, it would be unable to reach a decision; that he had reached a decision from the evidence and he did not believe his convictions could be changed; that he had no problem with the pressure or the high-profile nature of the case; and that he was not ill, incapacitated, or affected by any personal reasons such that he could not have continued the deliberations. Notwithstanding all of these facts, he was removed as a juror.

In examining this issue, we return to *Folkerts*, 229 Kan. at 616, where a juror was deemed to have been properly replaced due to

the death of a grandparent and the necessity of attending the funeral. Although the juror was dismissed prior to the submission of the case to the jury, we had no problem finding that the trial court's actions were based upon reasonable cause.

Again, in *Haislip*, 237 Kan. at 469-71, we found the discharge of a juror, this time during deliberations, who was considered "mentally incapacitated" because of "special pressure," to be based upon reasonable cause so that no abuse of discretion existed.

Another important case where this issue was raised is *State v. Stallings*, 246 Kan. 642, 792 P.2d 1013 (1990). In that case, the juror was dismissed and replaced with an alternate during deliberations after a conversation with the juror revealed that religious scruples had surfaced which prevented the juror from making a decision in the case.

In comparing this situation to *Folkerts* and *Haislip*, we stated in *Stallings*:

"In comparison, the juror in the present case did not express his religious concerns during voir dire, although counsel specifically addressed the issue. Furthermore, the juror indicated to the trial judge that he was the deciding vote in jury deliberations. However, the juror also stated that he could not make a judgment because of his religious beliefs. Altogether, the juror's statements indicate he may have sought his dismissal from the jury panel because of his belief in Stallings' innocence. Nevertheless, the note and personal statements reveal a concern due to religious convictions.

"In *State v. Miller*, 11 Kan. App. 2d 410, 722 P.2d 1131, *rev. denied* 240 Kan. 805 (1986), a juror notified the court at the end of the first trial day that she had not heard some testimony. The appellate court found that a juror's specific factual statement about her ability to hear should control over a judge's opinion regarding her ability to hear. The court concluded the juror should have been discharged for cause and a mistrial declared and found the refusal to sustain a motion for mistrial an abuse of discretion. 11 Kan. App. 2d at 411-13.

"*Miller* is distinguishable from the present case in that it involved a juror's physical handicap which prevented her from evaluating the testimony. In this case, the juror was impaired by his religious convictions. The *Miller* court dealt with the trial court's failure to dismiss a juror and should not stand for the proposition that a mistrial must be declared when a juror is found physically incompetent.

"Under the facts of this case, we find the court had reasonable cause to dismiss the juror and replace him with an alternate. Stallings failed to show substantial prejudice and we therefore find no abuse of discretion in the trial court's ruling." 246 Kan. at 647-48.

Although a juror was not replaced in *State v. Bowser*, 252 Kan. 582, Syl. ¶ 1, 847 P.2d 1231 (1993), we held that an ex parte meeting between a trial judge and a juror during deliberations violated the defendant's right to be present whenever the trial judge communicates with the jury. In *State v. Knapp*, 234 Kan. 170, 189, 671 P.2d 520 (1983), and *State v. Lovely*, 237 Kan. 838, Syl. ¶ 1, 703 P.2d 828 (1985), we concluded that because of the weight of the evidence, such communications outside the defendant's presence were harmless. In *Bowser*, we reached the opposite result because the trial judge's dialog with the holdout juror "changed the outcome of the trial." 252 Kan. at 588. The judge instructed the juror to resume deliberations, creating "a reasonable inference to the juror" (confirmed by the verdict rendered the following morning) that the judge wanted her to participate with the other jurors in reaching a verdict irrespective of her individual judgment.

Another case where the replacement of a juror during deliberations was not deemed improper is *State v. Minski*, 252 Kan. 806, 850 P.2d 809 (1993). There, after a juror fainted, part of the juror's conversation with the court regarding her being excused was off the record, with neither Minski or his counsel present. Our opinion looked to *Stallings, Haislip,* and *Folkerts* and focused on the physical infirmities of the juror as providing a clear resolution of the claimed mistrial. We found the trial court "should be allowed to discharge jurors for reasonable cause if they are found to be unable to perform their duties. Reasonable cause existed here." 252 Kan. at 815.

With this history of juror substitutions, we move to our most recent case, *Stafford*, 255 Kan. at 807, where we held a juror was improperly replaced during deliberations concerning a hard 40 sentence. We have previously referred to *Stafford* on the question regarding the failure to instruct the jury to begin deliberations anew and now consider it as it relates to adequate reason to justify the replacement of a juror. The facts in *Stafford* showed that the juror responded affirmatively when asked if she felt that the other members were set on one side, with her on the other side. She said she felt that the jury had no choice as to the decision to make. The juror thought the jury misunderstood and was confused about the

court's instructions, and she did not feel that she could discuss the matter with the other jurors or that submitting a question to the court would help. She stated that she was becoming physically ill, although that was not the reason given for her dismissal.

The defense counsel in *Stafford* objected, contending that there was nothing indicating the juror was unable to serve and that a juror should not be dismissed for not wanting to make a difficult decision. The State responded that the juror did appear physically distressed and would not make a decision even though she apparently knew a decision had to be made. The trial judge ruled:

" 'I feel that she did fully understand that [she had the prerogative to not make a decision] and that—and that she simply, in her own words, was—unable to serve, and there was an adamancy in her demeanor and her voice and her responses; and, for those reasons, Court found her to be unable to serve.' " 255 Kan. at 822.

*Stafford* found the trial court's excusal of the juror to be "troublesome." 255 Kan. at 824. After reviewing the wording of both *Stallings* and *Haislip* and observing that in a hard 40 case, a hung jury is not an undecided jury because by statute, K.S.A. 1993 Supp. 21-4624(5), a hung jury results in a sentence of imprisonment for life with eligibility for parole and precludes the hard 40 sentence, we held the trial court's finding that the juror was unable to serve did not set forth adequate reason to justify dismissing the juror. What we actually did was decide that reasonable cause did not exist to replace the juror and that the trial court abused its discretion in doing so.

With this history of our pronouncements on this issue, we have no hesitancy in holding the trial court failed to show any reasonable cause to excuse Barnes. The dismissal of Barnes was an abuse of discretion. The early mention in the transcript of the proceedings implicating Barnes' ability to remain fair and impartial is not sufficient to justify the trial court's actions in light of a reading of the entire transcript. This transcript reveals the dismissal of a juror who suffered from no impairment, who appeared to hold a different view of the case from the remaining jurors, who believed his convictions could not be changed, and who had been on the verge of being sent back to deliberate when he was, without reasonable

cause, discharged from further service. The juror was not ill, incapacitated, or affected by personal reasons; he had no problems with the high visibility of the case; and he clearly stated that if he remained on the jury, he did not believe a decision could be reached. There is a total absence of any justifiable reason for the dismissal. In the wording of our case law, there was no reasonable cause for Barnes to be released and an alternate juror to be seated.

We have stated a sufficient basis for our decision in this case, but we also recognize the *amicus curiae* contention that removal of a deliberating juror because of his or her belief concerning the outcome of the case is constitutionally improper. The basis for this argument is our PIK Crim. 3d 68.01 jury instruction: "Your agreement upon a verdict must be unanimous." The authority for this instruction is based on the fundamental right of any accused to a trial by jury, §§ 5 and 10 of the Kansas Constitution Bill of Rights, and K.S.A. 22-3403, together with our statute requiring a unanimous verdict under K.S.A. 22-3421.

The right to a unanimous verdict or, in the alternative, a jury unable to reach a verdict and the resulting mistrial pursuant to K.S.A. 22-3423(1)(d), would be lost if we permitted removal of a juror without reasonable cause so that a unanimous verdict could be reached. Reasonable cause remains the crucial factor in any inquiry regarding the propriety of dismissing a juror. However, that inquiry may be influenced by knowledge of whether the juror in question was a member of the majority, a member of the minority, or the sole remaining vote for either acquittal or conviction.

Under the facts of this case, we do not believe the voting position of the juror was a factor in the trial court's decision, nor should it ever be. See *e.g., U.S. v. Hernandez,* 862 F.2d 17 (2d Cir.), *cert. denied* 489 U.S. 1032 (1988); *U.S. v. Brown,* 823 F.2d 591 (D.C. Cir. 1987).

Our principal point remains. There was no evidence Barnes was unable to render a decision or that his inability was based on anything other than his view of the evidence. The juror should have been returned to the jury for further deliberations. As we held in *Stafford,* 255 Kan. 807, and more firmly hold here, no reasonable

cause existed to support the dismissal of the juror. We hold this dismissal is reversible error requiring the grant of a new trial.

Because of the result we reach, we will not consider or comment on the numerous other allegations of error made by the appellant. By our failure to do so, we neither condone nor reject such allegations, but simply refuse to discuss in the abstract issues which have no effect on our decision.

Reversed and remanded with instructions to the trial court to grant a new trial.

ALLEGRUCCI, J., concurring in the result.