No. 82,504

STATE OF KANSAS, *Appellee*, v. JASON A. FULTON, *Appellant*.
(9 P.3d 18)

Opinion filed July 21, 2000.

*Benjamin C. Wood*, of Lawrence, was on the brief for appellant.

*Tony W. Rues*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Defendant Jason A. Fulton was convicted by a jury of one count of felony murder, one count of conspiracy to possess cocaine, and one count of attempted possession of cocaine. He appeals the convictions.

On July 31, 1997, Kevin Fraser died from gunshot wounds inflicted as he was leaving the scene of a failed drug deal. His bodyguard, Silas Swopes, was shot and wounded. They were at a house at 424 SE Locust in Topeka to sell a half kilo of cocaine. There were four other people present in the house during the aborted deal. Derrick Frank and Gabriel Winfield lived in the house. Defendant and his brother, James Fulton, were there to buy cocaine.

Defendant was convicted of the felony murder of Fraser, conspiracy to possess cocaine, and attempted possession of cocaine. Swopes, Frank, and Winfield testified for the State.

For several years before the killing, Frank regularly bought large quantities of marijuana from his friend, Fraser, and resold it. In July 1997, defendant talked to Frank about getting a substantial quantity of cocaine from Fraser. Frank talked to Fraser, and eventually a deal was arranged. On July 31, Frank called defendant and told him that they had half a kilo of cocaine for him, that the price was $15,300, and that they would meet him at Frank's house at approximately 6:30 that evening.

Frank got home at approximately 6:30. Gabriel Winfield was there. Then Fraser and Swopes arrived. Fraser was carrying a laundry basket with a scale and a plastic bag of cocaine hidden under some clothes. Fraser and Swopes each carried a gun. When defendant had not arrived by 6:43, Frank paged him three times in 3 minutes. He arrived shortly after that.

Frank expected defendant to come alone, but he arrived together with his brother, James. They came into the house through the back door. Frank told Winfield to watch the front of the house.

Frank thought everyone seemed edgy. He made the introductions and then took Jason and James into the bathroom to get them calmed down. He was in the bathroom with them for approximately 25 minutes. During that time defendant and James Fulton questioned the price and the quality of the cocaine, and defendant said they would not be able to do the drug deal at Frank's house.

When Frank and the Fultons emerged from the bathroom, Frank apologized to Fraser for the problems. With Fraser, Swopes, Frank, and the Fultons in the kitchen, Fraser offered to lower the price by several hundred dollars.

Concerned that something was not right, Frank went out the back door to check around. He realized that the Fultons had not driven a car, which was a signal to him that the Fultons came for some purpose other than to buy cocaine. Before Frank could go back into the house, he heard gunshots.

Inside the house, Fraser put the scale and the cocaine back in the basket and told the Fultons to call when they were ready to deal. Swopes and Fraser started to go out the back door to their car. Defendant yelled at them. Swopes turned and saw defendant pointing two guns at him and Fraser. When defendant demanded the cocaine, Fraser and Swopes handed it to him. Within seconds, Swopes heard gunshots. The Fultons and Frank ran away. Swopes initially told officers he could not identify the shooter. However, he later gave details of the shooting to Officer Campbell at the hospital. Swopes is a convicted felon and made a deal to testify for the State.

Winfield ran out the front door when he heard shots. He made his way to the back of the house where he saw Swopes walking around with two gunshot wounds and Fraser on the ground by the back door. Winfield called 911. Winfield testified that he was high and drunk the day of the shooting. He admitted to giving the police different stories but denied he saw who did the shooting. He also testified that he and Frank smoked marijuana or drank every day. Frank also testified he did not see who did the shooting.

Mark Hall, a man who lives several blocks from Frank, testified that he was sitting in his driveway the evening of July 31, 1997. He heard gunshots. Within a few minutes he saw defendant and another man running toward him. Both had guns that looked like they had been fired, and they were carrying something. They offered drugs in exchange for a hiding place, but Hall refused. The two men hollered at someone who was driving by. When the driver stopped, they got into the car with him and rode away.

The following day, defendant's girlfriend drove into Kansas City to see him. She returned to Kansas City to see him on August 2 and then never saw him again.

The autopsy of Fraser's body revealed seven gunshot wounds, which were the cause of his death. All the shots came from behind him.

We first consider if reversal is required due to juror misconduct. The trial judge granted defendant's pretrial request to exclude evidence concerning Jerry Hall, a material witness who had been murdered before defendant's trial began. The trial judge stated that he prohibited mention of Jerry Hall and his murder due to "concern that it might inflame the jury and make them think that the defendant was involved in more than one murder."

Jerry Hall had told police that his brother, Mark Hall, saw Jason and James Fulton running and carrying guns that had been fired. At trial, Mark Hall gave the following testimony on behalf of the State: He lived about a block and a half from where Kevin Fraser was shot. He was sitting in his driveway with Quinton White when he heard gunshots and a few minutes later saw two men carrying guns come into his yard. He identified the men as Jay Rock and Shorty (the defendant and James Fulton). They wanted to give Hall some cocaine for letting them hide in his house, but he refused. When a man called Sisco drove by, the Fultons yelled at him. They and Quinton White got in the car with Sisco and drove away. Mark Hall concluded his testimony by giving an affirmative answer to the prosecutor's question: "Do you have any concerns about your safety?"

The trial judge's ruling on defendant's pretrial motion kept the jurors from hearing testimony about Jerry Hall, but they heard defense counsel mistakenly call Mark Hall by his brother's name, Jerry Hall. Then, during deliberations, Juror No. 15 talked to the other jurors about Jerry Hall's murder.

While the jury was deliberating, the trial judge received a written question signed by the presiding juror. It stated:

" 'In the course of our deliberations one of the members of the jury introduced some information relative to the brother of one of the brothers, Jerry Hall brother of Mark Hall, whose situation could potentially influence the circumstances of this case. Is that appropriate or is it a concern that should be addressed?' "

The prosecutor suggested that the jury be brought into the courtroom and admonished to consider only facts in evidence, and then each individual juror should be asked to state yes or no on the record whether he or she could abide by the admonition and

reach a verdict strictly on the basis of the evidence. Defense counsel wanted to send a note to the presiding juror asking for the juror who mentioned Jerry Hall to meet with the trial judge and counsel to answer questions about the extent and timing of his or her knowledge and what he or she communicated to the other jurors. The trial judge rejected both suggested approaches in favor of his disqualifying the juror who ignored the court's instructions. Defense counsel objected and requested a mistrial.

The record resumes with the parties, counsel, and jurors reconvened in the courtroom. Off the record and in private discussions, the trial judge had disqualified the misbehaving juror and replaced her with the alternate juror:

"Ladies and Gentlemen, I am going to send you back into the jury deliberations room to recommence deliberations. You have a new juror aboard. You need to start from the beginning and redeliberate this case. I need to re-read an instruction to you. Instruction Number 20 I will read it again to you. Please pay careful attention to this instruction as you do all instructions in this case.

"Number 20, insofar as the jury is concerned, you may consider as evidence whatever is admitted in the trial as part of the record, whether it be the testimony of witnesses or an article or document marked as an exhibit or other matter admitted, such as an admission, agreement or stipulation.

"Ladies and Gentlemen, during the course of your deliberations if anything outside of the evidence in this case has been brought up to you in the course of your deliberations you are to absolutely and unequivocally disregard it.

"Please retire to the jury deliberations room, thank you."

The defendant's motion for new trial centered on the trial judge's dismissing the misbehaving juror and replacing her with the alternate juror. For this reason, Judge Andrews, who presided at trial, testified at the hearing, and defendant's motion for new trial was considered and ruled upon by the Honorable James P. Buchele.

Judge Andrews testified that he had talked with the presiding juror and that no record was made of the discussion. He asked the presiding juror to identify which juror mentioned Jerry Hall, and the presiding juror told him who it was.

Judge Andrews testified that he then talked with the misbehaving juror and that no record was made of the discussion. He tes-

tified that the juror acknowledged that she had mentioned Jerry Hall.

"I asked her if she gave any details about the Jerry Hall murder. She advised she had not, and then she volunteered to me that she was concerned for her safety, and I asked her if she wanted to be removed from the trial, she indicated she did. I asked her if she had expressed any concern about her personal safety to the other jurors, and she said she had not."

Justifying his action in removing the juror, Judge Andrews testified:

"I did have a juror that had been sequestered throughout who had been admonished at every recess, had been there for every readback, and who had been under the very close and watchful eye of my bailiff, so I thought the simplest and purest thing to do in this trial was to just go ahead and remove the offending juror. I was satisfied she had not said enough, based on what she told me, to taint the jury, and move on forward with an alternate."

Asked why he removed the juror if he was satisfied she had not tainted the jury, Judge Andrews responded: "Well, I was afraid she might bring the issue up again. It could have definitely gotten more complicated, and, to me, it was just an easier issue to go ahead and remove her and put a fresh juror in there."

It is a well-established rule in both civil and criminal cases that juror misconduct is not a ground for reversal, new trial, or mistrial unless it is shown by the party claiming error to have substantially prejudiced his or her rights. *State v. Franklin*, 264 Kan. 496, 502, 958 P.2d 611 (1998); *State v. Goseland*, 256 Kan. 729, 735, 887 P.2d 1109 (1994). The State's argument on appeal is devoted to convincing the court that defendant was not prejudiced by the juror's misconduct. Defendant sidesteps the issue of showing prejudice. He cites *State v. Cheek*, 262 Kan. 91, 936 P.2d 749 (1997), as placing limitations on dismissing a juror. He reasons that the trial judge necessarily found misconduct because the trial judge dismissed the juror, which he was prohibited by the rule of *Cheek* from doing without reasonable cause. On a different tack, he relies on *Saucedo v. Winger*, 252 Kan. 718, 850 P.2d 908 (1993), in contending that the trial judge's failure to allow inquiry, without more, required a mistrial.

Defendant's effort to equate cause for dismissing a juror with cause for a mistrial is without merit. K.S.A. 1999 Supp. 22-3412(c) authorizes substitution of an alternate juror during deliberations:

"[I]f any regular juror shall be discharged from jury service . . . prior to the jury reaching its verdict, the court shall draw the name of an alternate juror who shall replace the juror so discharged and be subject to the same rules and regulations as though such juror had been selected as one of the original jurors."

Our case law permits removal of a juror only where there is reasonable cause. In *Cheek*, the court stated:

"The right to a unanimous verdict or, in the alternative, a jury unable to reach a verdict and the resulting mistrial pursuant to K.S.A. 22-3423(1)(d), would be lost if we permitted removal of a juror without reasonable cause so that a unanimous verdict could be reached. Reasonable cause remains the crucial factor in any inquiry regarding the propriety of dismissing a juror." 262 Kan. at 108.

Our case law, however, does not require more than a reasonable cause for replacement of a juror during deliberations. On the other hand, K.S.A. 22-3423(1)(c) provides that the trial judge may order a mistrial at any time he or she finds termination is necessary because "[p]rejudicial conduct . . . makes it impossible to proceed with the trial without injustice to either the defendant or the prosecution." Thus, the vital difference between cause for dismissing a juror and cause for a mistrial is prejudice—the element that defendant urges the court to disregard.

*Saucedo* has been discussed quite recently by the court in *Franklin*, 264 Kan. at 501:

"The majority of the court held:
" 'A party is denied the right to a fair trial when a juror introduces evidence on material issues of fact to the jury during its deliberations. Plaintiff did not receive a fair trial because, under the facts of this case, the two incidents of jury misconduct introduced extraneous evidence during jury deliberations which had a substantial effect upon the issues and the validity of the verdict. The trial judge's refusal to recall the jury and determine whether the extraneous evidence substantially affected the jury's verdict was error which requires that plaintiff receive a new trial.' " (Quoting *Saucedo*, 252 Kan. at 733.)

Defendant would have the court conclude on the basis of the ruling in *Saucedo* that the trial judge's failure to inquire and/or refusal to permit inquiry about the effect on the jury of the extraneous in-

formation about Jerry Hall is error requiring reversal. In other words, defendant's position with regard to prejudice is that it must be presumed because the inquiry necessary to determining whether prejudice occurred was thwarted by the trial judge's actions.

The State insists that the lack of prejudice is apparent from available facts. The State first directs the court's attention to the presiding juror's note as evidence that Juror No. 15's introduction of information about Jerry Hall did not have a substantial effect on the jury's deliberations. The State would have the court conclude from the presiding juror's phrase "could potentially influence the circumstances of this case" that Juror No. 15's revelation had not yet tainted deliberations at the time the note was written. This argument necessarily concedes that the potential remained for the extraneous information to affect the course of ensuing deliberations. The same is true of the State's second point, that the presiding juror's asking for guidance demonstrated that the jury was not tainted at the time the note was written. As a fallback, the State argues that if there were prejudice at that time, it was cured by the trial court's answering the presiding juror's yes-or-no question. Perhaps the State means that the trial judge's removing Juror No. 15, the source of the extraneous information, and admonishing the remaining jurors to confine their deliberations to facts in evidence cured any taint. With regard to the admonition, the State notes that as a general rule juries are presumed to have followed instructions given by the trial court. *State v. Tyler*, 251 Kan. 616, Syl. ¶ 13, 840 P.2d 413 (1992).

The State also cites the mixed verdict as evidence of a lack of prejudice. Of the seven counts on which defendant was tried, the jury reached a unanimous decision only on three. The jury was unable to reach a unanimous decision on the charges of aggravated robbery, conspiracy to commit aggravated robbery, aggravated battery, and aggravated assault with a deadly weapon. The State contends that the mixed verdict shows that the jury carefully considered the evidence on each count, which is not the behavior of a tainted jury.

The State also urges the court to consider the length of the deliberations after Juror No. 15 was dismissed as indicating the thorough, unprejudiced nature of the jury's consideration. For the fact that 3 hours elapsed between the alternate's joining the jury and its returning the verdict, the State cites the trial judge's testimony. He first testified that "it was probably about three hours before they came back with a verdict." Then, under questioning by the prosecutor, revised his estimate to 2 hours. From the trial transcript, it can be ascertained that the case went to the jury in the morning on June 29, 1998, that the jury resumed deliberations at 1:30 after going to lunch, and that the jury was sent home for the evening and resumed deliberations in the morning on June 30. At approximately 12:15, the jury was sent to lunch and told to return at 1:45. While the jury was gone, the trial judge advised counsel of the presiding juror's note about Juror No. 15. When the jurors returned from lunch, the trial judge spoke to the presiding juror, dismissed Juror No. 15, activated the alternate juror, and briefly instructed the jury before sending it back into deliberations. The transcript shows that at 4:30 the jury had reached its partial verdict. The 2 to 3 hours the State estimated as the time the alternate juror participated in deliberations appears to be accurate. Whether it is indicative of a lack of prejudice is another question. If it is a factor favoring the State's position, it is not a strong one. The jury's deliberations after Juror No. 15 was dismissed amounted to considerably less time than those she participated in.

The last bit of evidence the State cites as showing lack of prejudice is the trial judge's account of his discussion with Juror No. 15. According to the trial judge, she acknowledged mentioning Jerry Hall by name, and he "asked her if she gave any details about the Jerry Hall murder." He also asked her if she expressed concern about her personal safety to other jurors. She answered "no" to both questions. On the basis of this testimony, the State would have the court conclude that she had not tainted any of the other jurors. The trial judge's testimony, however, leaves material questions unanswered. What did she know about Jerry Hall? How did she know it? Why did she bring him up in deliberations? Did she talk to other jurors about a connection between the murder de-

fendant was charged with and the murder of Jerry Hall? Why was she concerned for her own safety? Was there any discussion among jurors about concerns for personal safety?

The record, as the State advocates, fails to show that defendant suffered prejudice from Juror No. 15's misconduct. However, the question is whether the usual requirement of a showing of prejudice pertains in the circumstances of this case, where defendant's request to inquire was rejected. In *Saucedo*, the trial judge's refusal to recall the jury to determine whether the extraneous evidence substantially affected the verdict required a new trial. The State reminds the court that *Saucedo* involves the discovery of juror misconduct after the verdict was rendered and contends that, here, the trial judge's discussion with Juror No. 15 during deliberations was the functional equivalent of recalling all the jurors in *Saucedo*. As already discussed, though, the trial judge's questioning of Juror No. 15 leaves much to be desired.

However, the defendant failed to pursue his claim by utilizing the post-trial procedure to recall jurors and question them pursuant to K.S.A. 60-441. His argument would have more merit if he had done so. Further, the offending juror responded in the negative to the question of whether she had said anything about Jerry Hall's murder. It appears Jerry Hall's only role in this tragedy was to notify the police that his brother had observed the defendant on the night in question. We also find this situation somewhat analogous to cases in which the trial court fails to admonish the jury prior to a recess. Although it is error not to do so, we have held prejudicial error will not be presumed from such failure to admonish the jury. See *State v. Ralls*, 213 Kan. 249, Syl. ¶ 8, 515 P.2d 1205 (1973). The defendant here had the burden to show prejudice, and he failed to do so.

A related issue is whether defendant was denied his right to be present at all critical stages of the proceedings. Defendant cites *State v. Bowser*, 252 Kan. 582, 847 P.2d 1231 (1993), arguing that he has a constitutional right to be present when the trial judge meets with jurors. It is settled that a conference between a trial judge and a juror is a critical stage of the trial at which a criminal defendant has a constitutional right to be present. *State v. High*,

260 Kan. 480, Syl. ¶ 2, 922 P.2d 430 (1996). Thus, the State concedes error in the trial judge's having ex parte discussions with the presiding juror and Juror No. 15. The State, however, contends that the error was harmless. The standard of review suggested by the State is as follows:

"An error of constitutional magnitude may be held to be harmless if the appellate court can declare a belief that it was harmless beyond a reasonable doubt. In order to declare the constitutional error harmless, an appellate court must be able to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial." *High*, 260 Kan. 480, Syl. ¶ 3.

The State contends that, for all the reasons set out in the discussion of Issue 1 as to why there was no prejudice to defendant from the juror misconduct, the court should declare harmless error here. There are several noteworthy differences between the inquiry in Issue 1 about prejudice and the inquiry in this issue. The first difference is simple—the constitutional error standard requires the court to find *beyond a reasonable doubt* that there was no prejudice. The second difference illustrates why this issue, on its own, lacks merit.

The standard applicable in Issue 1 focused on harm resulting from the juror's misconduct. The standard suggested by the State for this issue focuses on harm resulting from the trial judge's discussion with the juror. Focusing on harm from the judge-juror discussion made sense in a case like *Bowser*, where the judge's dialogue with a holdout juror convinced her to vote with the majority. It does not make sense in the present case where the juror's misconduct during deliberations was the source of any harm. The real significance of the defendant's exclusion from the judge-juror communication in the present case is that it created difficulties for defendant's showing prejudice from the juror's conduct during deliberations. However, as previously discussed, there were other avenues available to defendant to determine the existence of prejudice. Defendant's absence during the judge's conference with the juror does not require reversal if it is deemed harmless error. We believe beyond a reasonable doubt that the ex parte communication between the judge and the juror had no likelihood of changing the results of the trial. We find the error to be harmless.

Defendant next argues that it was reversible error for the trial court to permit one State's witness to vouch for the credibility of another. Defendant complains of the following testimony elicited from Detective Thomas Young on examination by the prosecuting attorney:

"Q. . . . . Are you able to tell the level of truthfulness by the details in which they give you facts about what took place knowing what other people have told you also?·

[Defense counsel's objection overruled.]

"A. In this particular case in this interview I found what Mr. Frank told me to be believable.

"Q. . . . . Based upon those facts?

"A. Yes.

"Q. Based upon other information that you knew?

"A. Yes.

. . . .

"Q. What about his candor about the drug deal? Did he give you a lot of details?

"A. My opinion was he was very open about the drug transaction."

The State seems to concede that admission of Young's opinion about the truthfulness of witness Derrick Frank was error. The State argues that it was invited error and harmless error.

With regard to invited error, the State quotes instances in which defense counsel asked witnesses whether they believed something that had been told to them. The State's argument seems to be that defense counsel's practice of asking witnesses to express an opinion about someone's veracity led the prosecuting attorney to do the same. The State misconstrues the concept of invited error, which involves a litigant's leading *the trial court* into error. See *State v. Borman*, 264 Kan. 476, 480, 956 P.2d 1325 (1998) (jury instruction requested by defense counsel improperly complained of on appeal). What the State seems to have in mind is that the prosecuting attorney was justified in his questioning of witness Young by the defense counsel's questions to other witnesses. No authority is cited for this proposition, and common sense suggests that it is a matter that should have been resolved with contemporaneous objections rather than retaliation in kind.

The admission of evidence lies within the sound discretion of the trial court. Defendant, who complains of it, bears the burden

of showing an abuse of discretion. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Defendant relies on *State v. Mullins*, 267 Kan. 84, 977 P.2d 931 (1999), and *State v. Jackson*, 239 Kan. 463, 721 P.2d 232 (1986). Both cases are prosecutions of sexual abuse of children, and at issue in both is an expert witness' expression of opinion on the credibility of the child victim. In *Jackson*, the trial court permitted two social workers, who were extensively trained in child abuse investigation, to opine that the 6-year-old victim was telling the truth and that the victim was sexually abused by the defendant. In a memorable phrase, the court stated: "Here, the witnesses attempted to serve as human lie detectors for the child and both told the jury that in their professional opinions the child was truthful and the defendant was guilty as charged." 239 Kan. at 470. Because determination of the victim's truthfulness had been taken from the jury where it rightfully belonged and given to expert witnesses, defendant's conviction was reversed. In *Mullins*, Pat Phillips, the assistant director for the sexual abuse program at KU Medical Center, conducted a physical examination of the child and found no signs of sexual abuse. With regard to her interview of the child, Phillips was asked: "Was there anything about that evaluation that caused you to be concerned that there might be coaching or that [the child] in some way would be making this up? Anything inconsistent in his statements regarding that?" 267 Kan. at 93. Phillips was permitted to answer over objection that she did not think that the child had been coached. The court found the line of inquiry to be improper but harmless because it was a single answer in the midst of the testimony of 12 trial witnesses.

The line of inquiry complained of in this case was also improper. In *Mullins*, the case of sexual abuse of a child, the essential question for the jury was whether the alleged criminal offense had occurred. Thus, the truthfulness of the child victim is the ultimate question. The truthfulness of the witness Derrick Frank is not the ultimate question in the present case, and it seems unlikely that Officer Young's finding Frank's story believable was of much significance to the jury. In the cited cases, the witnesses testified as expert witnesses and specifically vouched for the credibility of the child

victim's statements that went to the ultimate issue, which was for the jury to determine. That was not the circumstance in the present case and, although error, it was harmless.

The defendant next complains of the prosecutor's commenting that defense counsel misstated facts. This issue centers on what the prosecutor said in objecting to a question asked by defense counsel. Silas Swopes was testifying. Defense counsel asked whether Derrick Frank had paged him that day, and Swopes answered that he had not. Defense counsel followed up: "If he said he did he is lying about that?" The prosecuting attorney objected: "Objection, Your Honor, misstatement of fact *and defense counsel knows it.* He never testified to that fact." (Emphasis added.)

On appeal, appellant asserts that "defense counsel asked the Court to cure this situation" and phrases this issue in terms of the trial court's failure to admonish the jury. In fact, what defense counsel asked the trial court to do was to "admonish Mr. Rues," the prosecuting attorney. There is no merit to this argument.

Defendant next argues that the trial court should have given the accomplice witness instruction. The failure to give an instruction on accomplice testimony when none was requested is sufficient ground for reversal only if "clear error" occurred. *State v. DePriest,* 258 Kan. 596, 605, 907 P.2d 868 (1995). In *DePriest,* the court found no error: "Because there is corroboration of the accomplice's testimony, and because a jury of ordinary intelligence would naturally receive with caution the testimony of [the accomplice], we conclude that there was no real possibility the jury would have reached a different result had the instruction been given." 258 Kan. at 606.

Defendant gives the court very little to go on. He asserts that Frank and Swopes necessarily were his accomplices in that he was charged in the conspiracy count with agreeing with them to possess cocaine. Defendant, however, does not touch on the question of error.

The State's response dwells on corroboration of the accomplices' testimony. Only in the next-to-last sentence of its argument does the State seem to suggest that defendant's contention that Frank and Swopes were accomplice witnesses is questionable. With re-

gard to corroboration, the State sets out a substantial collection of evidence and supplies record references in support. Examination of cited portions of the record convince us that the instruction would not have affected the result reached by the jury. The trial court did not commit error in failing to give this instruction.

Defendant next argues that the attempt to possess cocaine is not an inherently dangerous felony within the meaning of the felony murder statute. The jury was instructed that defendant was charged with murder in the first degree in that the killing of Kevin Fraser was done while defendant was committing, attempting to commit, or in flight from committing one or more of the following crimes: (1) aggravated robbery, (2) possession of cocaine with intent to distribute, or (3) possession of cocaine. The only one of these crimes the jury agreed defendant was guilty of was attempt to possess cocaine with intent to distribute it.

Defendant claims that attempting to possess cocaine with intent to distribute is not one of the felonies identified in K.S.A. 21-3436(a) as one that will support a conviction of felony murder. There is no merit to his argument. The statute provides, in part:

"(a) Any of the following felonies shall be deemed an inherently dangerous felony whether or not such felony is so distinct from the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401 and amendments thereto as not to be an ingredient of the homicide alleged to be a violation of subsection (b) of K.S.A. 21-3401 and amendments thereto:

. . . .

(14) any felony offense as provided in K.S.A. 65-4127a, 65-4127b or 65-4159 or K.S.A. 1995 Supp. 65-4160 through 65-4164 and amendments thereto . . . ."

K.S.A. 1999 Supp. 65-4161(a) provides:

"Except as authorized by the uniform controlled substances act, it shall be unlawful for any person to sell, offer for sale or have in such person's possession with intent to sell, deliver or distribute; prescribe; administer; deliver; distribute; dispense or compound any opiates, opium or narcotic drugs, or any stimulant designated in subsection (d)(1), (d)(3) or (f)(1) of K.S.A. 65-4107 and amendments thereto. Except as provided in subsections (b), (c) and (d), any person who violates this subsection shall be guilty of a drug severity level 3 felony."

The statutory definition of narcotic drug includes "coca leaves and any salt, compound, derivative or preparation . . . thereof which

is chemically equivalent or identical with any of these substances." K.S.A. 1999 Supp. 65-4101a(p)(4).

The judgment of the district court is affirmed.