No. 63,619

STATE OF KANSAS, *Appellee*, v. DARRELL STALLINGS, *Appellant*.

(792 P.2d 1013)

Opinion filed May 25, 1990.

*Thomas H. Johnson,* assistant appellate defender, argued the cause, and *Jessica R. Kunen,* chief appellate defender, was with him on the brief for appellant.

*Jerome A. Gorman,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Nick A. Tomasic,* district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

HERD, J.: Darrell Stallings appeals from jury convictions of two counts of second-degree murder, K.S.A. 21-3402, and two counts of aggravated battery, K.S.A. 21-3414. Stallings was sentenced to concurrent terms of 15 years to life on each count of second-degree murder and concurrent terms of 5 to 20 years on each count of aggravated battery. The murder sentences run consecutive to the aggravated battery sentences.

Darrell Stallings sold drugs for his nephew Damon Huff. On the morning of January 14, 1988, Stallings received a phone call from Michael Mills, who wanted to talk with Huff about a prior drug deal. Previously, Huff had loaned drugs to Mills and held Mills' automobile as security for the loan. Stallings, Huff, and Jessie Jones drove to the residence of Donna Barrett, Mills' girlfriend, to force Mills to hand over title to the automobile.

Stallings and Huff entered the house without Jones and found Frank Morris and Julia Dawn there with Mills and Barrett. Morris testified that Stallings opened the door for a third man carrying a shotgun. Morris stated he also saw guns in both Stallings' and Huff's pants. Morris, Barrett, and Mills were seated on the couch with Jones in front of Morris, Stallings standing over Mills, and Huff standing over Barrett. Morris heard a shotgun blast and several other gunshots before passing out. Morris received extensive injuries to his forearm, forehead, wrist, and eye.

Julia Dawn testified she was in a sitting room behind a curtain when Huff sent her into the living room with the others. Dawn stated she saw Huff holding a gun before Jones came in with a shotgun. Dawn received gunshot wounds to the head.

Pursuant to a plea bargain, Damon Huff testified against Stallings. Huff stated he did not have a gun when he entered the house with Stallings and that Stallings opened the door for Jones, who carried a shotgun. Huff further testified that Stallings and Mills were arguing and that Huff pushed Mills down onto the couch and turned around. Huff heard a gunshot and turned around to see Stallings with a gun in his hand. Finally, Huff stated Stallings also shot Barrett and Morris, and Jones shot Morris with a shotgun.

Stallings testified in his own defense. He stated Huff hit both Mills and Barrett in the head with a hammer and ordered Jones to shoot Morris. Stallings stated Huff pulled a gun out of his pants and shot both Mills and Barrett in the head with a .38 revolver. Huff then pulled Dawn out of the sitting room, threw her on the floor, and shot her in the head.

Barrett and Mills each died from gunshot wounds to the head. Huff was arrested soon after the incident and pled guilty to second-degree murder and aggravated battery. Jones was convicted of first-degree murder and aggravated battery. *State v. Jones*, 246 Kan. 214, 787 P.2d 726 (1990). Stallings fled the state. On August 20, 1988, Stallings was arrested in Las Vegas, Nevada, where he gave a voluntary statement. He was charged with two counts of first-degree murder and two counts of aggravated battery. A jury convicted Stallings of second-degree murder and aggravated battery. This appeal followed.

Stallings first contends the trial court abused its discretion when it dismissed a juror and replaced him with an alternate. After the trial and during jury deliberations, the court received a note from an individual juror which stated, "Can a person be excused from the jury if they feel they cannot pass judgment?" In a different ink the note also stated, "Is because of religious belief."

The following private discussion ensued between the trial judge and the juror:

"The Court: Mr. Prince?

"Mr. Prince: Yes, sir.

"The Court: Why don't you tell me where we are at or what's taking place.

"Mr. Prince: Well, everybody's deciding on—

"The Court: Don't tell me about everybody else. I'm talking about you personally.

"Mr. Prince: *I'm—it's been revealed to me that he's not guilty.*
"The Court: Now, you say, revealed to you. The question I got is you don't feel like you can make a judgment because of religious belief. Is that correct?
"Mr. Prince: Yes, to an extent; yes.
"The Court: What religion are you?
"Mr. Prince: Baptist.
"The Court: And does your personal religion make you think you shouldn't judge other people?
"Mr. Prince: Yes.
"The Court: Do you remember the attorneys asking you on Monday morning if there is anyone who because of religious or conscience or other reasons couldn't pass judgment on somebody else?
"Mr. Prince: Yes, I remember them saying that.
"The Court: Any reason you didn't answer or say anything at that time?
"Mr. Prince: *Because I hadn't heard all the facts or the evidence, witnesses.*
"The Court: But now because of the facts and witnesses, you don't think your religion will let you pass judgment?
"Mr. Prince: No, sir; I don't.
"The Court: You don't believe you can discuss this with the other jurors and make a verdict just on the evidence in the case, setting aside your religious beliefs?
"Mr. Prince: *No, sir, I don't believe I could go along. I think they are wrong.*
"The Court: I'm talking about—take aside religion.
"Mr. Prince: You mean forgetting my religion and my belief and going through—
"The Court: Let me restate that. I don't want you to forget your religion or your belief in God, but what I am—if I hear you correctly, you are telling me because of your religious beliefs you don't think you can work as a juror on this case.
"Mr. Prince: No, sir.
"The Court: Okay.
"Mr. Prince: I don't think I can. As far as what I have already learned about it, I don't think I can.
"The Court: You don't think you can?
"Mr. Prince: No. I'm sorry that I didn't find out before now.
"The Court: Well, I can understand that. You've got two buttons. One says 'Jesus Christ Lives'; and one says "Jesus—
"Mr. Prince: '. . . is the reason for the season.'
"The Court: Just sit for a minute and let me go back out in the courtroom and—anything else you want to tell me or anything you want to ask me?
"Mr. Prince: Well, no, sir. Just like to say Jesus Christ loves you.
"The Court: Okay. Thank you very much." (Emphasis added.)

After finding the juror had religious scruples against making a decision in this case, the trial court removed the juror from the

panel and substituted an alternate juror with instructions to begin deliberations anew.

Stallings contends the trial court erred in substituting an alternate juror rather than declaring a mistrial. He argues the discussion with the trial judge shows that the juror believed him innocent after hearing the evidence and relied upon religious convictions as an excuse to get out of deliberations. Therefore, Stallings argues, the trial court should have informed the juror of his duty to return to deliberations if he believed Stallings was innocent. Stallings contends the result of deliberations with the original juror would have been an inability to reach a verdict, and under K.S.A. 22-3423(d) the trial judge would have been required to declare a mistrial.

The decision to declare a mistrial, discharge a juror, or select alternate jurors lies within the sound discretion of the trial court. The defendant has a burden of showing substantial prejudice before an appellate court will find an abuse of discretion by the trial court. *State v. Helms,* 242 Kan. 511, 517-18, 748 P.2d 425 (1988).

In *State v. Haislip,* 237 Kan. 461, 701 P.2d 909, *cert. denied* 474 U.S. 1022 (1985), we considered a case similar to the one at hand. In *Haislip,* a juror sent a note to the court on the second day of deliberations requesting that she be excused as a juror. The juror's note stated that the murder case bothered her from the beginning, that she was not the deciding vote, and that she wanted to be removed. Without a hearing, the trial judge excused the juror for incapacity due to stress and replaced her with an alternate juror. Haislip argued he was prejudiced by the decision because a hung jury would have resulted if the original juror had remained on the panel. 237 Kan. at 466-67.

We found Haislip's claim of prejudice, based on a speculated loss of a mistrial due to a hung jury, was without merit. 237 Kan. at 468-69. K.S.A. 22-3412(3) allows for substitution of an alternate juror after deliberations have begun as long as the alternate juror has not been discharged. Thus, this court concluded a defendant has no right to the original twelve jurors. 237 Kan. at 468.

Similarly, Stallings' argument that he was prejudiced by the court's refusal to declare a mistrial is without merit. Since Stallings does not hold a right to the original panel of jurors selected, he

was not prejudiced simply by the substitution of an alternate juror.

Next, we consider whether Stallings was prejudiced by an abuse of discretion in dismissing one juror and replacing him with an alternate. In *Haislip,* the court adopted the federal standard of "reasonable cause" to determine whether a trial court erred in dismissing and substituting a juror after deliberations had begun. 237 Kan. at 469; see *State v. Folkerts,* 229 Kan. 608, 616, 629 P.2d 173, *cert. denied* 454 U.S. 1125 (1981). During voir dire of the Haislip trial, the juror stated she felt pressured by the case, and in her note to the court she stated the murder bothered her. From these statements, the trial court determined the juror was mentally incapacitated and dismissed her. We concluded there was reasonable cause to dismiss the juror and found no abuse of discretion by the trial court. 237 Kan. at 469-71.

In comparison, the juror in the present case did not express his religious concerns during voir dire, although counsel specifically addressed the issue. Furthermore, the juror indicated to the trial judge that he was the deciding vote in jury deliberations. However, the juror also stated that he could not make a judgment because of his religious beliefs. Altogether, the juror's statements indicate he may have sought his dismissal from the jury panel because of his belief in Stallings' innocence. Nevertheless, the note and personal statements reveal a concern due to religious convictions.

In *State v. Miller,* 11 Kan. App. 2d 410, 722 P.2d 1131, *rev. denied* 240 Kan. 805 (1986), a juror notified the court at the end of the first trial day that she had not heard some testimony. The appellate court found that a juror's specific factual statement about her ability to hear should control over a judge's opinion regarding her ability to hear. The court concluded the juror should have been discharged for cause and a mistrial declared and found the refusal to sustain a motion for mistrial an abuse of discretion. 11 Kan. App. 2d at 411-13.

*Miller* is distinguishable from the present case in that it involved a juror's physical handicap which prevented her from evaluating the testimony. In this case, the juror was impaired by his religious convictions. The *Miller* court dealt with the trial court's failure to dismiss a juror and should not stand for the proposition

that a mistrial must be declared when a juror is found physically incompetent.

Under the facts of this case, we find the court had reasonable cause to dismiss the juror and replace him with an alternate. Stallings failed to show substantial prejudice and we therefore find no abuse of discretion in the trial court's ruling.

Stallings next contends the trial court erred in refusing to instruct on the lesser included offense of voluntary manslaughter. A trial court has an affirmative duty to instruct the jury on all lesser included offenses established by the evidence. K.S.A. 21-3107(3). Voluntary manslaughter K.S.A. 21-3403, the intentional killing of a human being without malice and in the heat of passion, is a lesser included offense of second-degree murder. *State v. Ritchey,* 223 Kan. 99, 100, 573 P.2d 973 (1977). An instruction on a lesser included offense must be given even though the evidence supporting the lesser offense may not be strong or extensive. However, the instruction need not be given if there is insufficient evidence by which a rational factfinder might find the defendant guilty beyond a reasonable doubt of the lesser included offense. *State v. Hill,* 242 Kan. 68, 73-74, 744 P.2d 1228 (1987).

Stallings maintains evidence was presented which supports his claim that the killings were committed in the heat of passion so as to justify the giving of an instruction on voluntary manslaughter. Stallings relies on testimony that he and Mills had pulled guns on each other prior to the January 14 shooting spree, thus showing bad blood existed between the two. Stallings also argues that Huff's testimony provided evidence that Stallings killed Mills in the heat of passion. Huff stated that Mills and Stallings were arguing face-to-face, and that he told Stallings to "cool down" and pushed Mills down onto the couch. When Huff turned around, he heard a gunshot and saw Stallings with a gun.

In *State v. Guebara,* 236 Kan. 791, 696 P.2d 381 (1985), this court summarized the general principles of law governing voluntary manslaughter: (1) Voluntary manslaughter is the intentional killing in the heat of passion as a result of severe provocation; (2) heat of passion is any vehement emotional excitement prompting violent and aggressive actions, and such emotional state of mind must be of such a degree as would cause an ordinary person to act on impulse without reflection; (3) defendant's emotional

state of mind must have existed at the time of the act and it must have arisen from circumstances constituting sufficient provocation, *i.e.*, provocation calculated to deprive a reasonable person of self-control and cause him or her to act out of passion rather than reason; (4) the test of sufficiency of provocation is objective; and (5) mere words or gestures, however insulting, do not constitute sufficient provocation. 236 Kan. at 796-97.

The defendant in *Guebara* killed his wife in a fit of anger over her inability to dismiss criminal charges against him that had been initiated by her. 236 Kan. at 792. The *Guebara* court found the defendant killed his wife in the heat of passion, but ruled that his emotional state did not arise from circumstances constituting sufficient provocation. No evidence was presented that showed the victim had been quarrelsome, had committed aggressive acts, or had attempted to interfere with the defendant's movements. Thus, this court found no error in the trial court's refusal to give a voluntary manslaughter instruction at trial. 236 Kan. at 797-99.

In the present case, we find no error in the trial court's refusal to instruct on voluntary manslaughter. Huff's testimony that Mills and Stallings argued face-to-face is insufficient to warrant a voluntary manslaughter instruction. Although Mills and Stallings argued, there is no evidence that Mills committed aggressive acts or made physical threats to Stallings (see *State v. Guebara*, 236 Kan. at 797), nor is there any evidence of physical assault by Mills together with abusive and insulting language. See *State v. Hill*, 242 Kan. at 74-76 (evidence of physical assault and abusive language directed toward defendant constitutes sufficient provocation to require a voluntary manslaughter instruction). Evidence that Stallings and Mills pulled guns on one another at a prior time is not relevant to whether there was sufficient provocation to reduce the killing to voluntary manslaughter. See *State v. Guebara*, 236 Kan. at 796. We conclude the evidence presented failed to show sufficient provocation necessary to support a voluntary manslaughter conviction and thus find no error in refusing to give a voluntary manslaughter instruction.

Stallings' final contention is that the trial court abused its discretion by imposing disparate sentences for comparable offenses. Stallings was sentenced to two concurrent terms of 15 years to

life for the second-degree murder convictions and to concurrent terms of 5-20 years for each aggravated battery conviction. The trial court ordered the murder sentences to run *consecutive* to the aggravated battery terms. Huff pled guilty to two counts of second-degree murder and two counts of aggravated battery; however, all his sentences run *concurrently*.

It is well established that this court will not disturb a sentence imposed by a trial court on the ground it is excessive, provided it is within the statutory limits and within the realm of the trial court's discretion and not the result of partiality, prejudice, oppression, or corrupt motive. *State v. Coberly,* 233 Kan. 100, 110, 661 P.2d 383 (1983).

Stallings does not contend the sentences imposed exceed the statutory limitation or that they are the result of partiality or prejudice. Rather, Stallings disputes the disparity of his sentence compared to Huff's and assigns error in his argument that Huff is the more culpable defendant. We do not agree.

K.S.A. 21-4601 mandates that defendants shall be sentenced in accordance with their individual characteristics, circumstances, needs, and potentialities. Further, K.S.A. 21-4606 sets forth specific criteria a trial court must consider before sentencing a defendant. The record before us reflects the trial court's consideration of these factors and the reasons for the sentence imposed. The court considered the extent of harm caused by Stallings' actions in that two people were dead and two others seriously maimed. The trial court noted that Stallings entered the house with a handgun, thereby intending to cause or threaten serious harm. The court found no justification for Stallings' criminal actions and recognized that he fled from the state to escape arrest and imprisonment. Most importantly, the trial court reviewed Stallings' history of prior criminal conduct and found juvenile vandalism, aggravated assault and battery, and a violation of group home placement.

This case is distinguishable from *State v. Goering,* 225 Kan. 755, 594 P.2d 194 (1979), and *Cochrane v. State,* 4 Kan. App. 2d 721, 610 P.2d 649 (1980), where trial court sentences imposed upon codefendants were deemed unacceptably disparate. In *Goering,* the defendant with the disproportionate sentence had the least culpable conduct in that she was merely the driver of the

getaway car which transported two other more culpable codefendants from the crime scene. 225 Kan. at 762. In *Cochrane,* the Court of Appeals found no justification for imposing a minimum sentence upon Cochrane which was 15 times greater than that imposed upon a codefendant; Cochrane had not been offered similar plea bargaining possibilities as had his codefendants, who had received lower sentences, and Cochrane had had no prior felony convictions or incarcerations. 4 Kan. App. 2d at 726-27.

In light of Stallings' prior criminal history and other individual characteristics, we find the trial court was justified in imposing a longer sentence for Stallings than for Huff.

The judgment of the district court is affirmed.