IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 114,682

STATE OF KANSAS,
*Appellee*,

v.

DUSTIN BRIAN HILT,
*Appellant*.

SYLLABUS BY THE COURT

1.

A district judge does not abuse his or her discretion by removing and replacing a hard 50 sentencing juror who consults a high school yearbook in violation of the judge's repeated admonitions.

2.

A prosecutor who summarizes jurors' role in a hard 50 sentencing proceeding as deciding whether the defendant gets the hard 50 or will be eligible for parole in 25 years does not misstate the law, when the proceeding is governed by a statute imposing a mandatory duty on the judge to sentence in accordance with the jury's verdict on mitigating circumstances not outweighing an aggravating circumstance proved by the State beyond a reasonable doubt.

1

3.

A prosecutor who tells jurors that they may vote in favor of a hard 50 sentence even if the State has not proved which codefendant inflicted specific blows or wounds suffered by a murder victim does not misstate the law, as long as the prosecutor's comments do not amount to telling the jury that the defendant's mitigating evidence about his passive role in the crime is wholly irrelevant.

4.

On the facts of this hard 50 sentencing case, tried under K.S.A. 2016 Supp. 21-6620(e), the district judge's statement in open court that the appropriateness of imposing the hard 50 "was the jury's decision and, therefore, I'm not going to upset the jury. I'm going to follow what the jury has entered and impose the sentence that the jury has entered" was a sufficient oral pronouncement of the defendant's sentence to reject appellate challenges alleging illegal ambiguity as to length and violation of the defendant's right to be present.

Appeal from Johnson District Court; JAMES CHARLES DROEGE, judge. Opinion filed December 15, 2017. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause, and *Kimberly Streit Vogelsberg*, of the same office, was on the brief for appellant.

*Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Stephen M. Howe*, district attorney, *James Crux*, legal intern, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

2

The opinion of the court was delivered by

BEIER, J.: Defendant Dustin Brian Hilt challenges his sentence for first-degree premeditated murder on three grounds: the district judge's decision to remove a juror during deliberations, allegedly reversible prosecutorial error during closing argument, and an imperfect oral in-court pronouncement of the ultimate hard 50 sentence.

We reject Hilt's arguments and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Hilt's 2010 jury convictions of first-degree premeditated murder, aggravated kidnapping, and aggravated robbery arose out of the violent death of his former girlfriend, Keighley Alyea. In *State v. Hilt*, 299 Kan. 176, 322 P.3d 367 (2014), this court affirmed Hilt's convictions and his grid sentences but vacated his hard 50 life sentence because it was based on fact-finding by a judge, a predicate procedure rejected by the United States Supreme Court as unconstitutional under the Sixth Amendment. See *Alleyne v. United States*, 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013).

Hilt's case was remanded to the district court for resentencing, and evidence was submitted before a jury on whether he should receive a hard 50 sentence over multiple days in June 2015. The State presented much of the same grisly evidence regarding the circumstances of Alyea's death that it had presented at Hilt's first trial. Another recitation of that evidence would serve no purpose here.

Certain other evidence at the resentencing trial demands mention because of its bearing on this appeal.

3

The State's case included testimony from several forensic experts, including evidence about bloodstains found in Alyea's car and on clothes worn by her and by Hilt and his two codefendants on the night of the murder. DNA testing showed large quantities of Alyea's blood on Hilt's clothes. Further, during police interviews in the days immediately following the murder, detectives noted that Hilt's hands and wrists were swollen and that he had cuts and abrasions on his hands and forearms. No similar injuries were found on his codefendants.

Hilt also testified in his defense during the resentencing trial; he had not testified in the original trial. He said that he had turned 18 a few days before the murder and had no criminal record beyond a handful of traffic tickets at the time.

Hilt claimed that there had been no plan to hurt or rob Alyea; he merely wanted a ride from her. After Alyea picked him and his friends up and allowed him to drive, one of his codefendants "just flipped out" and started hitting Alyea on the back of the head. Hilt testified he did not know what to do and "just started driving real fast trying to get away." At some point, under the codefendant's direction, Hilt stopped the car, and the codefendant put Alyea in the trunk. Hilt testified that at the time he believed Alyea was already dead.

Again following the codefendant's instructions, Hilt drove to the rural field where Alyea's body would eventually be found. During the trip, Hilt heard Alyea screaming for help from the trunk. Hilt testified that, after arriving at the field, he thought, "Like man, I can't let this go on no further. So when we get to the field, I popped the trunk and she gets out and takes off running." Hilt said that the other codefendant chased Alyea down and began kicking her and hitting her with the pipe. According to Hilt, he tried to put his hand over Alyea's head to protect her and push the codefendant back, "but it really didn't

4

work." After Hilt's attempt failed, the codefendant who had hit Alyea in the car repeatedly stabbed her.

Hilt denied striking or stabbing Alyea. He said that he had lied to police when they began questioning him because he was not sure whether Alyea was dead, and he did not want to get into trouble. Continuing to blame the codefendant who launched the violence, Hilt claimed that he had not called 911 anonymously because that codefendant told him not to do so.

After Hilt testified, the defense rested. The State called no rebuttal witnesses.

During the State's closing argument, the prosecutor began by highlighting the jury's role in the proceeding.

"As the Judge indicated and what's been previously discussed with you, this is a sentencing phase which is somewhat unique because you didn't participate in the guilt phase of this trial.

"However, this is just merely about one thing and one thing only; whether the Defendant's actions on those days, September 30, 2009, whether those actions by him support the sentence of life in prison without the possibility of parole for fifty years. That's ultimately what you're here to do; decide whether that is the appropriate sentence, or should he get the sentence of life in prison with the possibility of parole after twenty-five years."

The prosecutor then focused on the blood evidence establishing that Alyea's blood was on Hilt's clothes and argued that Hilt could not have been merely a passive and unwilling participant as he claimed, but must have been "an active member of the trio that went out and killed her in a brutal manner on that day." The prosecutor also highlighted the injuries to Hilt's hands and arms and the lack of similar injuries on the

5

codefendants. After doing so, the prosecutor posed the rhetorical question: "[I]s that a standby person not doing anything, or is that the person wielding the knife or the pipe?"

During defense counsel's closing, he painted a picture of Hilt as a passive character caught up in the murder, who did not know what to do or how to save Alyea.

"But that doesn't mean that he actively participated.

"The State has that burden.

"Simply being upset with Mr. Hilt because he was a coward that night does not allow the exchange to the idea that he affirmatively participated.

. . . .

"The State wants you to treat them all the same. The State says 'Because he's guilty and because it was bad, that's enough[.']

"But that's not why we're here.

"Any part of what Ms. Alyea had to endure is tragic.

"But the job of this jury is to apply the law for this particular type of crime to these particular circumstances and Mr. Hilt's unique circumstances."

The prosecutor began his rebuttal by noting that the State did not need to establish which defendant struck which blow.

"During your review of the evidence, one of the things that is clear is you don't have to determine which of the blows were inflicted by Dustin Hilt, which of them by Joe Mattox. That is not necessary for you to still find the Defendant guilty of the Hard 50."

6

The State then told the jurors that they should look at the clothes that Hilt was wearing that night because "they don't lie. They tell a story."

Throughout the trial, the district judge repeatedly admonished the members of the jury that they should not consult outside sources when considering the case. After the jury was selected, the district judge gave the jurors one such instruction, which was exemplary of similar instructions he gave before each court recess. The admonishment particularly focused on not using the internet to do additional research, but the judge also told the jurors repeatedly that they would "have all the evidence that [they] need in this case presented in this courtroom."

After deliberations began, the court received a question from the jury about whether one of their number should be excused from service. The question read: "One of the jurors [was] looking in a previous [] High School yearbook and saw Dustin Hilt. Should that juror be excused?" In response, the district judge and parties requested the name of the offending juror. After learning the name of the juror, the district judge had the juror brought out for questioning.

The juror told the judge in the presence of the prosecutors, defense counsel, and Hilt that during deliberations he had mentioned that he and Hilt both dropped out of the same high school. When asked by the other jurors how he knew that, he told them that he had seen it in an old yearbook. The juror explained to the court that he had looked only at Hilt's picture and at no other information. When pressed as to what prompted him to look at the yearbook, he told the court that one of the witnesses had testified that she went to that high school, and he had originally been looking for her picture. He then admitted that he had found her picture as well. In response to a question about whether he had accessed

7

the yearbook from his phone or other electronic device, he informed the court that he had looked at an actual physical yearbook that was in his home.

The prosecutor confronted the juror with the judge's admonition to "don't do that stuff and don't look outside of what the evidence is during the time of the trial." The juror agreed that the judge had repeatedly told the jury not to do those types of things. When asked, the juror said that he believed he could nevertheless remain fair and impartial.

The judge then sent the juror back to the deliberations room so that the judge and the parties could discuss how to handle the situation.

After the juror left, the judge said, "Yes, he violated my order," and expressed concern about whether the juror had been forthright when questioned. Although the juror had initially admitted to looking up Hilt's picture, it was only after additional questioning that he admitted he had also looked up one of the witnesses. The State agreed with the judge's assessment that the juror had violated the admonition. Hilt's attorney sounded less sure, saying the juror "didn't do anything to investigate this case." The judge responded that the juror had violated the spirit, if not the letter, of the judge's admonition and that "there's [not] one juror back there that didn't think that that was a violation of the order." The judge then decided to bring each juror out of the deliberations room one at a time to be questioned about the incident.

The first five jurors all recounted the same basic story: The juror had snuck into his sister's bedroom to look through her yearbook in order to find Hilt's picture. Each of the jurors was asked whether the juror's action would have an impact on his or her ability to decide the case on the evidence presented at trial. Each said it would not. In addition, one of the jurors noted that she had asked the juror whether his sister knew Hilt. The answer was no.

8

The sixth juror questioned expressed additional concerns. She noted that the other jurors had not reacted immediately to the juror's revelation about the yearbook. But, after it began to sink in, the other jurors started questioning whether the juror needed to be removed for violating the admonition. At that point, the juror backtracked and denied having looked at the yearbook.

When the remaining five jurors were questioned, each was asked about whether the juror had denied looking at the yearbook. Four of the five jurors confirmed that the juror had denied it or at least backpedaled from his original admission. The fifth said he missed much of the conversation.

After the last juror returned to the deliberations room, the district judge stated: "No. 1, he violated the admonition. Then secondly, it sounds like he's not the most forthright person to be sitting as the foreperson on this jury."

At that point, Hilt's counsel reiterated that he did not think the juror had done "anything investigating the crime. . . . He didn't try and do anything that would lead him to understand what happened that night. He wasn't looking at anything from 2009. He wasn't looking at any background." According to defense counsel, "He just wanted to know if he went to the same school and his sister went to the same school at the same time with a guy that was convicted of murder." Defense counsel concluded: "From a case standpoint, I'm not particularly troubled with what he did," but "[a]s an officer of the Court, I understand the Court's ruling, because he lied about it." To counsel, it seemed that "[i]f the Court simply excuses it, then what order do they need to abide by?" When asked personally, Hilt agreed with his counsel that the juror did not need to be removed.

9

The prosecutor argued that the juror should be removed. He had violated the admonition, which had been given many times. He acknowledged that he understood the admonition and yet still violated it. He initially admitted that he looked at Hilt's picture, but after more questioning admitted to looking at a witness' picture. After revealing what he had done to fellow jurors, he then denied it when they confronted him. The prosecutor also focused on the juror's statement that his sister did not know Hilt. The prosecutor asked: "How do you know that unless you talk to your sister about that? . . . [B]y virtue of his answer, that indicates there had to have been some dialogue between him and his sister for him to know that his sister did not know Dustin Hilt."

After hearing from both sides, the district judge concluded it was "clear" that the juror had violated the admonition and that "[i]t was misconduct." The juror also had not been "terribly forthright" with the court when asked what happened. But the judge ruled that the misconduct had not prejudiced the other jurors and that there was no need to call a mistrial.

The juror was removed and replaced with an alternate, and the jury began its deliberations anew.

The jury ultimately found that Hilt "committed the crime in an especially heinous, atrocious or cruel manner," an aggravating circumstance, and that the aggravating circumstance was not outweighed by any mitigating circumstances. Jurors included an additional handwritten explanation of their finding on the verdict form.

> "According to the definition of cruel, the defendant acted in a cruel manner shown by his
> utter indifference to the victim's suffering and exhibited a lack of pity by forgoing
> opportunities to help her during torture and several days after.

10

"We also find . . . the defendant's crime to be heinous and atrocious due to the torture to the victim and the continuous acts of violence against her according to evidence presented. These aggravating circumstances were not found to be outweighed by the mitigating circumstances."

After the jury verdict, there was some discussion among the district judge and counsel about whether an additional sentencing proceeding was necessary. Ultimately, all agreed that none was needed because the sentencing judge did not have the discretion to impose any sentence other than the hard 50 the jury had decided upon for the first-degree murder conviction.

In addition to discussing how to handle the sentence for premeditated murder, there was discussion about whether Hilt needed to be resentenced for his two grid convictions.

"[THE STATE]: Judge, if that is your position on the other two counts, then I'm comfortable with you imposing sentence. If you accept the jury's verdict and impose the sentence, then I agree with you that we don't need to have a subsequent hearing.

"THE COURT: Would you want me to schedule this for sort of a status conference for you all to kind of take a step back and come in and have a—have some sort of an argument, or do you want me to go ahead—if you feel that way—if that's the Court's proposed method of handling this, is to say the jury has spoken, they have imposed the hard 50 sentence on the defendant, then the Court will impose that based upon the jury's verdict. And that if—I would think there might be the possibility of the defendant just in any trial having the option to file post-trial motions."

Defense counsel was unsure at that time whether posttrial motions would be necessary, but the district judge decided to schedule a posttrial hearing just in case. The judge then stated:

11

"But my position is—and unless I'm—I'll go back and maybe I'll see something that changes my mind, but this was the jury's decision and, therefore, I'm not going to upset the jury. I'm going to follow what the jury has entered and impose the sentence that the jury has entered. That would be done with the journal entry, of course, and all I was going to do is fill out a custody slip that says that the defendant is remanded to serve his sentence at KDOC unless you want them to stay around until we have our next hearing."

The judge then asked that both parties put the journal entry together and submit it for the court's approval.

Hilt's counsel did file a motion for a new sentencing trial, asserting three separate grounds, one of which was the dismissal of the juror who looked at the yearbook. During discussion of that issue at a later hearing, defense counsel alluded to posttrial conversations that the parties had with members of the jury.

"What we learned from listening to the other jurors was that [the juror who looked at the yearbook] became the foreman and that [he] had a contrary opinion that the other jurors didn't share with regard to Mr. Hilt and that the other jurors saw an opportunity to latch on a way to get rid of a juror who didn't want to vote their way."

The prosecutor addressed the posttrial conversations defense counsel may have had with jurors.

"And as far as Mr. Billam's comments while he was in the minority, those are not comments that were part of the evidence. That was based on perhaps questions he asked after the fact talking to the jury. And what was really important is during our inquiry of the jurors, we made it clear that we didn't want to know what people's votes were, what their opinions were, whether or not the defendant should get the Hard 50. And none of the jurors articulated anything related to how they felt or what their position was. So the

Court made a decision not based on whether or not the offending juror was in the minority as far as his opinion on the aggravators, it was more about his conduct."

In rejecting the defendant's motion for new trial, the district judge mentioned the posttrial discussions with the jurors referenced by defense counsel.

"As it turns out later from discussion with the jurors later that he was possibly deliberating about issues that he wasn't even asked to deliberate about with whether or not the defendant was even guilty or not. Those were things that later were disclosed by the jury but not while we were making the decision as to whether or not [the juror who looked at the yearbook] should be removed for cause because of the violation of the admonition."

The judge then summarized the status of the case at that point.

"So I think that leaves us—I have already pronounced sentence. I have already ordered the execution of the sentence to issue. I don't know that there is anything else that I need to do at this point."

Based on its additional research, the State acknowledged that it was proper for the court to go ahead and execute the sentence based on the jury's verdict. At that point, the only thing that remained was preparation of the journal entry.

The eventual journal entry, backdated to the date that the jury reached its verdict, read as follows:

"Now on this 22nd day of June, 2015, this matter comes on for the penalty phase of the trial pursuant to K.S.A. 21-6620(c). The State of Kansas, appears by District Attorney Steve Howe and Assistant District Attorney Vanessa Riebli. The Defendant appears in person and with his counsel, Jason Billam.

13

"A jury is picked and sworn and the parties present opening statements. The State presents evidence and rests. The Defendant's motion for a directed verdict and or dismissal is denied. The Defendant presents evidence and rests. The Jury is instructed and the parties present closing arguments. The Jury begins deliberations. The Jury finds that the aggravating circumstances have been proven beyond a reasonable doubt and that the mitigating circumstances do not outweigh the aggravators. On count one of the Amended Complaint, the Jury imposes a life sentence with a mandatory minimum term of imprisonment of 50 years. The Court sets the matter over to July 21st, 2015, to allow the Defendant to file any post-trial motions."

## REMOVAL OF JUROR

"A district judge's decision to discharge a juror and substitute an alternate juror is reviewed for abuse of discretion." *Hilt*, 299 Kan. at 186. It is the defendant's burden to establish an abuse of discretion. 299 Kan. at 186. "'A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact.'" 299 Kan. at 186 (quoting *State v. Dobbs*, 297 Kan. 1225, 1232, 308 P.3d 1258 [2013]).

K.S.A. 2016 Supp. 22-3412(c) governs the empaneling and use of alternate jurors after deliberations have begun. It states in part:

"[I]f any regular juror shall be discharged from jury service in any such action prior to the jury reaching its verdict, the court shall draw the name of an alternate juror who shall replace the juror so discharged and be subject to the same rules and regulations as though such juror had been selected as one of the original jurors."

It is not an abuse of discretion to replace a dismissed juror with an alternate where "'reasonable cause' exists." 299 Kan. at 186 (quoting *State v. Stallings*, 246 Kan. 642, Syl. ¶ 2, 792 P.2d 1013 [1990]). Juror misconduct qualifies as reasonable cause. *Hilt*, 299

Kan. at 187-88. In addition, reasonable cause exists "when a juror becomes ill, incapacitated, or is affected by personal problems" or if a juror is unable to perform his or her duty. 299 Kan. at 186 (citing *Stallings*, 246 Kan. at 647-48; *State v. Haislip*, 237 Kan. 461, 468-71, 701 P.2d 909 [1985]; *State v. Folkerts*, 229 Kan. 608, 616, 629 P.2d 173 [1981]; *State v. Minski*, 252 Kan. 806, 815, 850 P.2d 809 [1993]).

In contrast, this court has held that there is

"no reasonable cause to dismiss a juror who suffered from no impairment; appeared to hold a different view from the other jurors; believed his convictions could not be changed; was not ill, incapacitated, or affected by personal problems; was unaffected by the high visibility of the case; and clearly stated that if he remained on the jury he did not believe a decision could be reached." *State v. Cheek*, 262 Kan. 91, Syl. ¶ 5, 936 P.2d 749 (1997).

This court also has observed that "jury misconduct occurs when, during deliberations, a jury considers matters completely outside the evidence and issues in the case." *State v. Leaper*, 291 Kan. 89, Syl. ¶ 4, 238 P.3d 266 (2010).

On appeal, Hilt argues that the district judge abused his discretion because his decision was based on an error of fact. According to Hilt, the juror who looked at the yearbook did not violate the judge's admonition because the admonition "focused on prohibiting Internet research, discussion of the case, viewing of news reports, or investigating crime scenes or evidence."

Hilt is correct that the district judge emphasized to the jurors that they should not use the internet for research. But, when the context of the full admonishment is considered, it is clear that the judge also conveyed that jurors should not turn to any outside sources relating to the case and should rely only on evidence presented at trial.

15

We note further that it is apparent the rest of the jurors believed a violation had occurred; they would not have otherwise inquired about removal. We have no hesitation in holding that the juror who consulted the yearbook violated the judge's repeated admonitions to do no investigation of any matter outside of the courtroom; this fact is well established in the record; and it qualified as reasonable cause for the juror's removal.

We nevertheless pause before moving to the next issue to address Hilt's alternative argument that a juror's failure to be "forthright" is not a proper basis for dismissal. In the abstract, again, we agree with him. It is not the function of a trial judge to conduct a general screening of jurors for good character and then remove those who fail to meet the judge's personal benchmarks for honesty or other positive traits. But Hilt is mistaken here when he treats the judge's expressed skepticism on the juror's honesty as though it formed an independent basis for removal and replacement. Our study of the record does not support this. The juror was not removed because of his spotty commitment to full disclosure. He was removed because he admitted to violating the judge's admonition. His perceived failure to be immediately and fully forthcoming about the violation cannot be divorced analytically from the violation itself. The combination means that the judge may have been appropriately concerned that the juror may have violated or might yet violate the admonition in other ways. See *Hilt*, 299 Kan. at 187 ("judge may 'reasonably conclude' juror who read newspaper accounts of trial 'cannot be counted on to follow instructions in future'"; quoting *People v. Daniels*, 52 Cal. 3d 815, 865, 277 Cal. Rptr. 122, 802 P.2d 906 [1991]).

Having held the district judge had reasonable cause to remove and replace the juror who consulted the high school yearbook, we see no abuse of discretion in his decision to do so. Because we hold there was no error, we need not reach the issue of whether any error was harmless, including the sufficiency or insufficiency of defense

counsel's statements after the trial about other jurors' motivations to remove an obstacle to unanimity on the hard 50 sentence.

## PROSECUTORIAL ERROR

This court applies a two-step process when reviewing allegations of prosecutorial error. First, an appellate court must decide whether the complained-of prosecutorial act falls outside the wide latitude afforded prosecutors to conduct the State's case in a manner that does not offend the defendant's right to a fair trial. *State v. Love*, 305 Kan. 716, 728, 387 P.3d 820 (2017) (citing *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 [2016]). Second, if there is error, an appellate court must determine whether the error prejudiced the defendant's due process right to a fair trial. *Love*, 305 Kan. at 728. To make that determination, the reviewing court applies the constitutional harmlessness inquiry from *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Love*, 305 Kan. at 109. Prosecutorial error is harmless if the State proves beyond a reasonable doubt the error will not or did not affect the trial's outcome in light of the entire record, i.e., when there is no reasonable possibility the error will contribute or contributed to the verdict. 305 Kan. at 728.

"A prosecutor is given wide latitude in closing arguments, but such arguments must remain consistent with the evidence." *State v. Pribble*, 304 Kan. 824, Syl. ¶ 6, 375 P.3d 966 (2016). Among other things, "[a] prosecutor may not misstate the law applicable to the evidence presented, may not offer a personal opinion about witness credibility, and may not shift the burden of proof to the defendant." 304 Kan. 824, Syl. ¶ 6.

Hilt argues that the prosecutor misstated the law in two passages of closing argument.

17

Hilt first takes issue with the prosecutor telling the jury it was there to determine whether Hilt should receive a hard 50 life sentence or be eligible for parole in 25 years. According to Hilt, under the governing statute, the jury's role is limited to finding "whether one or more aggravating circumstances exist, and, if so, whether the aggravating circumstances are outweighed by any mitigating factors."

The procedure for sentencing of a defendant convicted of premeditated first-degree murder varies depending on when the crime was committed, in some cases allowing for district judge discretion to depart from a jury's determination that a hard 50 is appropriate. See K.S.A. 2016 Supp. 21-6620(c), (d). But the statutory subsections governing Hilt's crime make a hard 50 sentence mandatory once a jury has found beyond a reasonable doubt that an aggravating circumstance exists and that it is not outweighed by any applicable mitigating circumstances. See K.S.A. 2016 Supp. 21-6620(e)(1), (5) (governing first-degree premeditated murder convictions committed after July 1, 1999, and before September 6, 2013; once jury makes necessary findings, defendant "shall" be sentenced to hard 50 under K.S.A. 2016 Supp. 21-6623); K.S.A. 2016 Supp. 21-6623 (defendant "shall be sentenced to imprisonment for life," "shall not be eligible for parole prior to serving 50 years' imprisonment"; "[u]pon sentencing a defendant pursuant to this section, the court shall commit the defendant to the custody of the secretary of corrections").

Because the district judge had no discretion to deviate from the jury's verdict on the hard 50 in this case, the prosecutor's statement to the jury about its role in the proceedings did not misstate the law; it merely summarized its ultimate duty in everyday language. We see no error in this passage of the prosecutor's closing argument.

Hilt also challenges the prosecutor's statement that the jury did not have to determine which blows Hilt inflicted and which the codefendant inflicted. Because one of the mitigating factors Hilt sought to demonstrate was his relatively passive participation in the crime, especially as contrasted with the aggression of his codefendants, he argues, "in order to comply with Kansas law, the jury *did* necessarily have to consider those facts."

Again, although Hilt's general point is well taken, it does not help him on the specific record before us.

It is certainly true that Hilt's jury was required to determine whether the one aggravating circumstance alleged—that the murder was committed in an especially heinous, atrocious, or cruel manner—existed and then to determine whether it was outweighed by any mitigating circumstances. See K.S.A. 2016 Supp. 21-6620(e) (necessity of finding aggravating circumstance, comparing its weight to mitigating circumstances); K.S.A. 2016 Supp. 21-6624(f) (heinous, atrocious, or cruel manner on exclusive list of aggravating circumstances; such behaviors may include infliction of mental anguish, torture, and continuous acts of violence). And K.S.A. 2016 Supp. 21-6625 provides a nonexclusive list of mitigating factors that includes limited participation by the defendant, worded thus: "The defendant was an accomplice in the crime committed by another person, and the defendant's participation was relatively minor." K.S.A. 2016 Supp. 21-6625(a)(4).

But, read in context, we do not agree that the prosecutor's statement amounted to telling the jury that Hilt's level of passive or active participation was wholly irrelevant. The prosecutor merely told the jury that imposition of the hard 50 did not necessarily *require* parsing who delivered each blow and stab wound suffered by Alyea. This was a correct statement of the law. In addition, speaking directly to the point of Hilt's testimony

19

and argument against imposition of the hard 50, the prosecutor then immediately went on to highlight blood evidence tending to show that Hilt had been an active participant. This argument was appropriate and implicitly acknowledged the jury's duty to consider the mitigating circumstance during its deliberations.

In view of all of the above discussion, we hold that the prosecutor did not exceed the wide latitude permitted him in discussing the evidence in this case. He did not misstate the law; there was no prosecutorial error.

PRONOUNCEMENT OF SENTENCE

Hilt characterizes his allegation that the district judge did not properly pronounce his sentence as both a challenge to an illegal sentence and a challenge to violation of his right to be present at sentencing.

Although Hilt has not filed a motion to correct illegal sentence, this court has statutory authority to consider an illegal sentence for the first time on appeal. See *State v. Luarks*, 302 Kan. 972, 975, 360 P.3d 418 (2015) (citing K.S.A. 22-3504[1]; *State v. Dickey*, 301 Kan. 1018, 1034, 350 P.3d 1054 [2015]). An illegal sentence is "'(1) a sentence imposed by a court without jurisdiction; (2) a sentence that does not conform to the applicable statutory provision, either in the character or the term of authorized punishment; or (3) a sentence that is ambiguous with respect to the time and manner in which it is to be served.'" *Dickey*, 301 Kan. at 1034 (quoting *State v. Trotter*, 296 Kan. 898, 902, 295 P.3d 1039 [2013]); see also K.S.A. 22-3504(3), as amended by L. 2017, ch. 62, § 9.

20

To the extent that Hilt argues that his right to be present at a critical stage of his trial was violated by his sentencing procedure, this court exercises de novo review. *State v. McDaniel*, 306 Kan. 595, 395 P.3d 429 (2017).

On his first challenge to the pronouncement—that it resulted in an illegal sentence—Hilt argues ambiguity on the length of his sentence. In his view, "the jury only made factual findings to *support* a certain sentence" rather than creating a mandate that the hard 50 be imposed.

We have already rejected a similar argument with respect to Hilt's argument on prosecutorial error. In this case, given the timing of the murder and the language of the governing statute, the district judge had no discretion to deviate from the hard 50 the jury found to be supported. See K.S.A. 2016 Supp. 21-6620(e); K.S.A. 2016 Supp. 21-6623. He clearly said as much: "[T]his was the jury's decision and, therefore, I'm not going to upset the jury. I'm going to follow what the jury has entered *and impose the sentence that the jury has entered*." (Emphasis added.) There was no illegal ambiguity. See *State v. Swafford*, 306 Kan. 537, 541-42, 394 P.3d 1188 (2017) (no illegal ambiguity created when judge's oral pronouncement made sentence consecutive to sentences previously imposed under specific case number without specifying county; "describing the sentence to which the current sentence was to run consecutive as the one 'previously imposed in case 92-CR-1286' clearly and unambiguously communicated to the parties, their counsel, and to this court the precise sentence that was being imposed"; journal entry stating county as well consistent with pronouncement); see also *Abasolo v. State*, 284 Kan. 299, 304, 160 P.3d 471 (2007) (discrepancy between pronounced sentence, journal entry; pronounced sentence controls).

Hilt's second challenge to the pronouncement addresses what he terms his statutory and common law right to be present. He argues that the district judge failed to

pronounce his sentence fully in open court, and the later journal entry could not correct this error.

K.S.A. 2016 Supp. 22-3405 requires that a defendant in a felony case be present at every stage of his or her trial, including the imposition of sentence, while K.S.A. 22-3424 requires that a criminal "judgment shall be rendered and sentence imposed in open court." Our caselaw also has articulated a corollary to these rules: "'The court's judgment and sentence in a criminal case do not derive their effectiveness from the journal entry, or from any act of the clerk; they are effective when announced.'" *State v. Phillips*, 289 Kan. 28, 33, 210 P.3d 93 (2009) (quoting *State v. Royse*, 252 Kan. 394, 397, 845 P.2d 44 [1993]). "'The journal entry "is thus a record of the sentence imposed; but the actual sentencing occurs when the defendant appears in open court and the judge orally states the terms of the sentence."'" *Phillips*, 289 Kan. at 33 (quoting *Abasolo*, 284 Kan. at 303). Announcing the sentence in the defendant's presence "protects the defendant's rights, as '[t]he defendant is personally present [when the sentence is imposed], and thus knows that *at that moment* he or she has been sentenced, fined, or placed on probation, or that the imposition of sentence has been suspended.'" *Abasolo*, 284 Kan. at 308.

It is true that this particular resentencing was conducted fairly early in post-*Alleyne* reality; before *Alleyne* was decided by the U.S. Supreme Court in the early Summer of 2013, Kansas had not required jury fact-finding on the balance of aggravating and mitigating circumstances before a mandatory minimum sentence such as the hard 50 could be imposed. See, e.g., *State v. Conley*, 270 Kan. 18, Syl. ¶ 3, 11 P.3d 1147 (2000) (imposition of hard 40 based on fact not found by jury does not increase defendant's maximum sentence; no constitutional violation); *State v. Harris*, 293 Kan. 798, 817, 269 P.3d 820 (2012) (declining to revisit *Conley*). After *Alleyne*, in the Fall of 2013, the Kansas Legislature modified the governing statutes to provide for jury fact-finding. See K.S.A. 2013 Supp. 21-6620; K.S.A. 2013 Supp. 21-6624. But the amendments did not

settle every conceivable question. For instance, here, the district judge, the prosecutor, and counsel for Hilt had to pause at the remand trial in 2015 to discuss whether a separate sentencing hearing was necessary, given the mandatory nature of the jury's verdict. The judge's ultimate conclusion that no such hearing was needed and his statements in Hilt's presence—"[T]his was the jury's decision and, therefore, I'm not going to upset the jury. I'm going to follow what the jury has entered and impose the sentence that the jury has entered"—constituted an adequate, if not perfect, pronouncement. At that stage of the proceedings, Hilt could not have been unaware of exactly what the judge meant. Hilt was sentenced to life in prison, with no eligibility for parole for 50 years. The judge "clearly and unambiguously communicated to the parties, their counsel, and to this court the precise sentence that was being imposed." *Swafford*, 306 Kan. at 542. Hilt's right to be present at his sentencing was not violated.

CONCLUSION

We reject defendant Dustin Brian Hilt's three arguments on appeal of his hard 50 sentence. The district judge did not err in removing and replacing a juror who violated the judge's repeated admonitions not to consult sources other than the evidence admitted at trial to arrive at a verdict. The prosecutor did not commit error by misstating the law governing Hilt's resentencing jury trial. And the judge's pronouncement of the hard 50 sentence did not create an illegal ambiguity in the length of Hilt's sentence or violate Hilt's statutory right to be present at sentencing. The judgment of the district court is affirmed.